Revised May 14, 1999

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 98-10193
_____


REVEREND PAMELA COMBS,

Plaintiff-Appellant,

VERSUS


THE CENTRAL TEXAS ANNUAL CONFERENCE OF THE UNITED METHODIST
CHURCH (a non-profit corporation) and THE FIRST UNITED METHODIST
CHURCH OF HURST,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Texas
_____
May 3, 1999

Before DAVIS, SMITH, and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Reverend Pamela Combs appeals the dismissal of her Title VII
sex and pregnancy discrimination suit against the First United
Methodist Church of Hurst ("First United") and the Central Texas
Annual Conference of the United Methodist Church ("Central Texas
Conference").  The sole question presented in this appeal is
whether the district court correctly determined that the Free
Exercise Clause of the First Amendment precluded it from
considering Reverend Combs's employment discrimination case.  For
the reasons that follow, we conclude that the district court was

correct and affirm.

## I.

The district court granted Central Texas Conference's Motion for Summary Judgment and also granted First United's Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Therefore, on appeal, we review the facts, including credibility determinations and the reasonable inferences that may be drawn from the facts, in the light most favorable to the nonmoving party, Plaintiff Reverend Combs. See, e.g., Wynn v. Washington Nat'l Ins. Co., 122 F.3d 266, 268 (5th Cir. 1997). The facts of this case, when viewed in such a light, are summarized as follows.

Reverend Combs is a graduate of the New Orleans Theological Seminary. In 1988, she was ordained as a Baptist minister. In 1993, she was hired as First United's Singles Minister. In late 1994, she was appointed First United's Associate Minister. In this new position, she served communion, assisted in baptisms, performed marriages, and led funerals.

In February 1995, as part of the long process of having her ordination recognized within the Methodist Church, she was interviewed by the United Methodist Board of Ordained Ministry, which unanimously recommended to the Bishop of the Central Texas Conference that she be ordained. In June 1995, she was appointed by the Bishop, Joe A. Wilson, to serve for the next year as a minister at First United.

In October 1995, Reverend Combs, who was--and still is--married, announced that she was pregnant. She requested and was granted maternity leave for the expected childbirth. In March 1996, she had her annual interview with the United Methodist Board of Ordained Ministry. The board again recommended unanimously that Reverend Combs continue with the process of having her ordination recognized within the Methodist Church.

Around this time, Reverend Combs questioned why her pay was substantially lower than that of the male ministers she had replaced. She also requested a housing allowance because she and her family had moved out of the parsonage to free up space for other church use. In response, the Staff Parish Relations Committee made several adjustments to her compensation package.

In April 1996, Reverend Combs took some accrued vacation time and began her eight-week maternity leave, as provided for clergy by the rules of the United Methodist Church Book of Discipline. On April 17, 1996, she gave birth. Unfortunately, however, Reverend Combs suffered serious post-partum complications, which required hospitalization, surgery, heavy medication, and extensive rest.

During this period of incapacitation, Reverend Combs's position within First United was questioned by her pastor and immediate supervisor, Dr. John Fielder. He challenged her competence, performance, and honesty. In addition, one of First United's oversight committees stated that she was a lay employee rather than a member of the clergy. The church then denied her the maternity benefits she had been granted and demanded she repay

3

those benefits that had already been paid to her.

Nevertheless, in June 1996, the Bishop of the Central Texas Conference reappointed Reverend Combs as an Associate Minister for First United. However, when Reverend Combs returned to work on June 17, 1996, she was told by Dr. Fielder that she had been terminated and that she was required to leave the premises immediately. The next day, Reverend Combs went to the Staff Parish Relations Committee. The committee stated that Dr. Fielder said she had resigned and that the committee had accepted her resignation. Reverend Combs protested that she had not resigned, but to no avail. Reverend Combs then brought the matter to the attention of the Central Texas Conference. However, she found no support from that organization either.

Reverend Combs filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The EEOC dismissed the claim under Section 702 of Title VII, which permits religious organizations to discriminate on the basis of religion. 42 U.S.C. § 2000e-1. The EEOC, however, did grant Reverend Combs a "right to sue" letter.

Reverend Combs sued both the Central Texas Conference and First United, alleging discrimination on the basis of her sex and her pregnancy in violation of Title VII. She alleged that the deprivation of her benefits and her termination were the conclusion of a practice of discrimination that included disparate salary and treatment while she was employed.

In response to this suit, Defendant Central Texas Conference

4

filed a Motion for Summary Judgment arguing, among other things, that the decision to terminate Reverend Combs was shielded from governmental review by the Free Exercise Clause of the First Amendment. Defendant First United filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) predicated upon the same theory. On January 15, 1998, the district court granted these two motions and dismissed Reverend Comb's suit. The district court held that the First Amendment prohibits civil review of the Defendants' decision to terminate Reverend Combs and therefore the district court lacked jurisdiction over the case. Reverend Combs now appeals this dismissal.[1]

## II.

The question before us is whether the Free Exercise Clause of the First Amendment[2] deprives a federal court of jurisdiction to hear a Title VII employment discrimination suit brought against a church by a member of its clergy, even when the church's challenged actions are not based on religious doctrine.

All parties agree that prior to 1990, the district court

---

[1] All parties agree that, at least for the purposes of this appeal, the following facts are true: Reverend Combs was a member of the clergy performing traditional clerical functions; both Defendants are churches and at least one of them employed Reverend Combs; and Reverend Combs's claims are based purely on sex and pregnancy and do not directly involve matters of religious dogma or ecclesiastical law. In addition, for the purposes of this appeal, we assume that Reverend Combs's allegations are sufficient to support a finding of discrimination.

[2] The First Amendment provides, in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . "

decision would have been correct. In <u>McClure v. Salvation Army</u>, 460 F.2d 553, 560 (5th Cir. 1972), this Court established a church-minister[3] exception to the coverage of Title VII. In this appeal, however, Reverend Combs questions whether <u>McClure</u> and its church-minister exception still stand in light of the Supreme Court's decision in <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). To resolve this question, we start by reviewing <u>McClure</u> and move from that case forward.

A.

In 1972, this Court was asked whether Mrs. Billie McClure, a Salvation Army officer alleging discrimination on the basis of her sex, could state a claim against the Salvation Army under Title VII of the Civil Rights Act of 1964. <u>McClure</u>, 460 F.2d at 554-57. Relying in part upon the findings of the district court, this Court determined that the Salvation Army was an "employer" under Title VII, and that the Salvation Army was engaged in interstate commerce. <u>Id.</u> Therefore, the Court determined that the Salvation Army fell within the general coverage of Title VII. <u>Id.</u>

The Court also determined that the Salvation Army was a church and that Mrs. McClure was an ordained minister within that church. These findings required the Court to address two further questions: Was the Salvation Army exempt from Title VII under Section 702's

---

[3] Courts have called this exception both the church-minister exception and the ministerial exception. We use both terms interchangeably.

6

religious exemption? If not, did the First Amendment exempt the Salvation Army's treatment of Mrs. McClure from federal review under Title VII?

In answering the first question, the Court concluded that although Section 702 exempts religious organizations from Title VII's coverage for religious discrimination, it does not provide a blanket exemption for all discrimination. Title VII still prohibits a religious organization from discriminating on the basis of race, color, sex, or national origin. Id. Because Mrs. McClure was alleging discrimination on the basis of her sex, this Court held that her claim did not fall within the Section 702 exemption.

After determining that Mrs. McClure's claim fell within the statutory coverage of Title VII, the Court addressed whether the Free Exercise Clause of the First Amendment permitted such a claim by a minister against her church. The Court began by noting that the First Amendment has built a "wall of separation" between church and state. Id. After describing this wall, the Court stated:

> Only in rare instances where a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate" is shown can a court uphold state action which imposes even an "incidental burden" on the free exercise of religion. In this highly sensitive constitutional area "'[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963).[4]

This Court then emphasized the importance of the relationship

---

[4] This reference to the "compelling state interest" test set forth in Sherbert will become important in light of later Supreme Court decisions.

7

between an organized church and its ministers, describing it as the church's "lifeblood."  McClure, 460 F.2d at 558-59.  The Court reviewed a series of cases in which the Supreme Court had placed matters of church government and administration beyond the regulation of civil authorities.  Id. at 559-60 (citing and describing Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871) (affirming state court decision not to become involved in factional dispute within church); Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929) (declining, absent fraud, collusion, or arbitrariness, to involve secular courts in matters purely ecclesiastical); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952) (holding that legislation transferring control of Russian Orthodox churches from Patriarch of Moscow to convention of North American churches is unconstitutional interference with the free exercise of religion); Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 80 S. Ct. 1037, 4 L. Ed. 2d 1140 (1960) (overturning, as unconstitutional involvement in matters of church administration, state court ruling that Patriarch of Moscow did not control Russian Orthodox churches within North America); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (warning against civil court involvement in church property litigation)).

After reviewing this Supreme Court precedent, the McClure Court determined that applying Title VII to the employment relationship between the Salvation Army and Mrs. McClure "would

8

involve an investigation and review . . . [that] would . . . cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern." McClure, 460 F.2d at 560. Thus, the Court held that applying Title VII to the relationship under consideration "would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." Id. The Court therefore affirmed the district court's dismissal of Mrs. McClure's claim.

Most of our sister circuits adopted the church-minister exception articulated in McClure. See, e.g., Natal v. Christian and Missionary Alliance, 878 F.2d 1575, 1577-78 (1st Cir. 1989); Rayburn v. General Conf. of Seventh-day Adventists, 772 F.2d 1164, 1168-69 (4th Cir. 1985); Hutchinson v. Thomas, 789 F.2d 392, 393 (6th Cir. 1986); Young v. Northern Illinois Conf. of United Methodist Church, 21 F.3d 184, 185 (7th Cir. 1994); Scharon v. St. Luke's Episcopal Presbyterian Hosp., 929 F.2d 360, 363 (8th Cir. 1991); Minker v. Baltimore Annual Conf. of United Methodist Church, 894 F.2d 1354, 1358 (D.C. Cir. 1990). Although the Supreme Court itself has never adopted the McClure exception, it is the law of this circuit and much of the rest of the country.

B.

Reverend Combs contends in this appeal that the McClure church-minister exception cannot stand in light of the Supreme Court's decision in Employment Division, Department of Human

9

Resources of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).

In Smith, Alfred Smith and Galen Black were fired by their employer because of their sacramental use of peyote--a controlled substance under Oregon law--within the Native American Church. Oregon denied unemployment benefits to Smith and Black because they were terminated for "misconduct"--a violation of Oregon criminal law. Smith and Black argued that the Free Exercise Clause of the First Amendment prohibited Oregon from denying them benefits solely because they ingested peyote for sacramental purposes. Id. at 874-77, 110 S. Ct. at 1597-99. In order to resolve this issue, the Supreme Court considered whether Oregon was constitutionally permitted to include the religious use of peyote within its general criminal prohibition of that drug. Id. at 874, 110 S. Ct. at 1597.

The Supreme Court determined that Oregon's prohibition on all peyote use did not violate the First Amendment: "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Id. at 879, 110 S. Ct. at 1600 (citations and internal quotation marks omitted). In arriving at this conclusion, the Supreme Court specifically rejected the "compelling state interest" test set forth in Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963). The Court then held that because Oregon was constitutionally permitted to prohibit Smith's and Black's ingestion of peyote, Oregon was also

10

constitutionally permitted to deny them unemployment benefits when their dismissal resulted from their use of the drug.  Smith, 494 U.S. at 890, 110 S. Ct. at 1606.

Congress attempted to reverse Smith legislatively by passing the Religious Freedom Restoration Act of 1993 ("RFRA"), Pub. L. No. 103-141, 107 Stat. 1488, codified at 42 U.S.C. § 2000bb et seq. (1994), which granted religious organizations broad immunity from neutrally applicable laws.  One of the stated goals of RFRA was to restore the compelling interest test from Sherbert that the Supreme Court had rejected in Smith.

The Supreme Court, however, held RFRA to be unconstitutional. In its 1997 decision in City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997), the Supreme Court adopted its earlier analysis in Smith.  In a passage now quoted by Reverend Combs, the Court stated, "When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened more than other citizens, let alone burdened because of their religious beliefs."  Id. at --, 117 S. Ct. at 2171.

Reverend Combs's argument that McClure cannot stand in light of the Supreme Court's decisions in Smith and Boerne is relatively straightforward:  First, in Smith and Boerne, the Supreme Court held that the First Amendment does not bar the application of facially neutral laws even when these laws burden the exercise of religion.    Second, McClure was based on the now-rejected "compelling interest" test.  For these reasons, Reverend Combs

11

argues that McClure no longer controls and therefore she should be permitted to pursue her Title VII discrimination claim against First United and the Central Texas Conference.

1.

A well-reasoned opinion from the D.C. Circuit recently considered the precise question presented to us. In E.E.O.C. v. Catholic University, 83 F.3d 455 (D.C. Cir. 1996), that court was asked whether, in light of Smith, a professor who was also a Catholic nun could sue Catholic University for sex discrimination in the denial of her application for tenure.[5] In resolving this issue, the D.C. Circuit addressed the post-Smith validity of the ministerial exception.[6]

The D.C. Circuit began its analysis by making the important distinction between two different strands of free exercise law. The court stated, "government action may burden the free exercise of religion, in violation of the First Amendment, in two quite different ways: by interfering with a believer's ability to observe the commands or practices of his faith, . . . and by encroaching on the ability of a church to manage its internal affairs." Id. at 460 (internal citations omitted). The court emphasized that the Supreme Court has shown a particular reluctance to interfere with

---

[5] The D.C. Circuit determined that the nun, Sister McDonough, was included within the coverage of the ministerial exception. Catholic University, 83 F.3d at 463-64.

[6] The D.C. Circuit focuses on both McClure and Minker v. Baltimore Annual Conference of United Methodist Church, 894 F.2d 1354, 1358 (D.C. Cir. 1990), in which the D.C. Circuit adopted the ministerial exception.

a church's selection of its own clergy. Id. (citing Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 16, 50 S. Ct. 5, 7-8, 74 L. Ed. 131 (1929); Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 717, 96 S. Ct. 2372, 2384, 49 L. Ed. 2d 151 (1976)).

The court concluded that Smith did not address the Free Exercise Clause's protection to a church against government encroachment into the church's internal management. Catholic University, 83 F.3d at 461. Rather, Smith only addressed the strand of Free Exercise Clause protection afforded an individual to practice his faith. Thus, the Catholic University court determined that the language in Smith that the plaintiff relied on--"the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability . . . ," Smith, 494 U.S. at 879, 110 S. Ct. at 1600--did not mean that a church, as opposed to an individual, is never entitled to relief from a neutral law of general application.

The D.C. Circuit provided two main reasons for its conclusion. First, the court stated that:

> [T]he burden on free exercise that is addressed by the ministerial exception is of a fundamentally different character from that at issue in Smith and in the cases cited by the [Supreme] Court in support of its holding. The ministerial exception is not invoked to protect the freedom of an individual to observe a particular command or practice of his church. Rather it is designed to protect the freedom of the church to select those who will carry out its religious mission. Moreover, the ministerial exception does not present the dangers warned of in Smith. Protecting the authority of a church to select its own ministers free of government interference does not empower a member of that church, by virtue of his beliefs, to become a law unto himself. Nor does

13

the exception require judges to determine the centrality of religious beliefs before applying a "compelling interest" test in the free exercise field.

Catholic University, 83 F.3d at 462 (internal quotation marks and internal citations omitted).

Second, the D.C. Circuit acknowledged that the Supreme Court had rejected the "compelling interest" test cited by some courts (including McClure) when invoking the ministerial exception. The court observed, however, that many courts applying the exception rely on a long line of Supreme Court cases standing for the fundamental proposition that churches should be able to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Catholic University, 83 F.3d at 462 (quoting Kedroff, 344 U.S. at 116, 73 S. Ct. at 154). The D.C. Circuit concluded, "we cannot believe that the Supreme Court in Smith intended to qualify this century-old affirmation of a church's sovereignty over its own affairs." Catholic University, 83 F.3d at 463.

2.

We agree with both the reasoning and the conclusion of the D.C. Circuit. Especially important is that court's distinction between the two strands of free exercise cases--restrictions on an individual's actions that are based on religious beliefs and encroachments on the ability of a church to manage its internal affairs. Reverend Combs acknowledges this distinction, but argues that it does not determine the outcome of this case. Instead, Reverend Combs contends that Smith and Boerne indicate that the

14

constitutional protection for religious freedom is impermissibly broadened when it grants churches immunity from employment actions by clergy when such actions are not based on questions of religious dogma or ecclesiastical law.  We disagree.

Smith's language is clearly directed at the first strand of free exercise law, where an individual contends that, because of his religious beliefs, he should not be required to conform with generally applicable laws.  The concerns raised in Smith are quite different from the concerns raised by Reverend Combs's case, which pertains to interference in internal church government.  We concur wholeheartedly with the D.C. Circuit's conclusion that Smith, which concerned individual free exercise, did not purport to overturn a century of precedent protecting the church against governmental interference in selecting its ministers.

We also disagree with Reverend Combs's argument that McClure is no longer good law because it relied on the "compelling state interest" test rejected by the Supreme Court in Smith.  Our review of McClure reveals that although this Court presented the "compelling state interest" test in its general discussion of First Amendment law, the test is never applied or even mentioned later in the opinion.  Thus, it is unclear how much this Court was actually relying on this test.  Moreover, even if the McClure panel was relying on the Sherbert test, we hold that the church-minister exception survives Sherbert's demise.  As the D.C. Circuit observed in Catholic University, the primary doctrinal underpinning of the church-minister exception is not the Sherbert test, but the

15

principle that churches must be free "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Kedroff, 344 U.S. at 116, 73 S. Ct. at 154 (cited by this Court in McClure, 460 F.3d at 560, and by the D.C. Circuit in Catholic University, 83 F.3d at 462). This fundamental right of churches to be free from government interference in their internal management and administration has not been affected by the Supreme Court's decision in Smith and the demise of Sherbert.

3.

The final point to address is Reverend Combs's argument that Catholic University is distinguishable from this case because a resolution of Sister McDonough's claim in Catholic University would have required an evaluation of church doctrine, while there would be no such need in this case.

Sister McDonough was denied tenure at Catholic University at least in part because the reviewing committees decided that her teaching and scholarship failed to meet the standards required of a tenured member of Catholic University's Canon Law Faculty. Indeed at trial, the parties introduced an "extensive body of conflicting testimony" concerning the quality of Sister McDonough's publications. Catholic University, 83 F.3d at 465. We agree that the district court would have been placed in an untenable position had it been required to evaluate the merits of Sister McDonough's canon law scholarship. Having a civil court determine the merits of canon law scholarship would be in violent opposition to the

16

constitutional principle of the separation of church and state. See Presbyterian Church v. Mary Elizabeth Blue Hill Memorial Presbyterian Church, 393 U.S. 440, 445, 89 S. Ct. 601, 604, 21 L. Ed. 2d 658 (1969) (civil courts are not permitted to determine ecclesiastical questions). Reverend Combs argues that because the resolution of her claim, in contrast to that of Sister McDonough, requires no evaluation or interpretation of religious doctrine, her claim should be allowed to proceed.

Not long after our decision in McClure, this Court rejected a similar argument in Simpson v. Wells Lamont Corp., 494 F.2d 490 (5th Cir. 1974).[7] As this Court observed in Simpson, the First Amendment concerns are two-fold. 494 F.2d at 493-94. The first concern is that secular authorities would be involved in evaluating or interpreting religious doctrine. Id. The second quite independent concern is that in investigating employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal. Id. This second concern is the one present here. This second concern alone is enough to bar the involvement of the civil courts.

---

[7] In Simpson, the plaintiff argued that the McClure exception should not apply to his racial discrimination claim because it was unrelated to church dogma. This Court disagreed, however, and determined that the First Amendment protection relative to the relationship between a church and a minister extended beyond purely dogmatic issues. Id. at 493-94; see also Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S. Ct. 143, 154-55, 97 L. Ed. 120 (1953).

In short, we cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church.

## Conclusion

This case involves the interrelationship between two important governmental directives--the congressional mandate to eliminate discrimination in the workplace and the constitutional mandate to preserve the separation of church and state. As this Court previously observed in McClure, both of these mandates cannot always be followed. In such circumstances, the constitutional mandate must override the mandate that is merely congressional. Thus, we are persuaded that the First Amendment continues to give the church the right to select its ministers free from Title VII's restrictions.

Because the district court correctly dismissed Reverend Combs's suit, its judgment is AFFIRMED.