UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2004

(Argued: January 5, 2005                    Decided: February 16, 2006)

Docket No. 04-0743-cv
_____

JOHN PAUL HANKINS,

*Plaintiff-Appellant*,

v.

ERNEST S. LYGHT and NEW YORK ANNUAL CONFERENCE OF THE UNITED
METHODIST CHURCH,

*Defendants-Appellees*,

STONY BROOK COMMUNITY CHURCH,

*Defendant*.

_____

SOTOMAYOR, *Circuit Judge*, dissenting:

The Religious Freedom and Restoration Act ("RFRA") is not relevant to this dispute.

First, appellees have unambiguously indicated that they do not seek to raise a RFRA defense, and

the statute's protections, even if otherwise applicable, are thus waived. Second, the statute does

not apply to disputes between private parties. Third, we should affirm the judgment of the

district court without reaching the RFRA issue on the ground that Supreme Court and Second

Circuit precedent compels a finding that the Age Discrimination in Employment Act (ADEA), 29

U.S.C. § 621 et seq., does not govern disputes between a religious entity and its spiritual leaders.

1

The majority's opinion thus violates a cardinal principle of judicial restraint by reaching unnecessarily the question of RFRA's constitutionality. For these reasons, I respectfully dissent.

## A.

Because the parties' original submissions to this Court mentioned RFRA without providing a detailed analysis of either the Act's constitutionality or its relevance to this case, we ordered supplemental briefing. The letter-briefs submitted in response to our order make clear that appellees have waived any RFRA defense.

In several portions of appellees' supplemental brief that the majority neglects to mention, appellees state plainly that they do not intend to raise a RFRA defense. Appellees' supplemental brief explains that "the reference to RFRA in Appellees' [original] brief was for the limited purpose of providing an example of how critically the question of 'entanglement' was viewed" by Congress. In other words, appellees' aim was not to rely on the statute as a defense against appellant's claims, but merely to illustrate Congress's agreement with the proposition that "entanglement of the Government in church affairs [was] prohibited by the *First Amendment*." (emphasis added). In fact, appellees explicitly reject the application of RFRA to their claims because they believe that the statute does not apply to suits between private parties, and "the case at bar is a matter relating to a private employment situation and does not involve actions by the government." The letter-brief concludes: "We do not think this issue [RFRA] is determinative in the matters raised by this case." While the majority might find appellees' position unwise or "supris[ing]," Maj. Op. at 12, appellees' letter-brief clearly waives any RFRA defense.[1]

---

[1] In addition to ignoring most of the language in the appellees' brief relating to waiver, the majority opinion makes two factually erroneous claims regarding the content of the supplemental letter-briefs. First, the majority writes that "appellant argues that the RFRA is

2

The majority does not contest that RFRA's protections are generally waivable. Maj. Op. at 13; *see United States v. Amer*, 110 F.3d 873, 879 n.1 (2d Cir. 1997); *see also In re Watson*, 403 F.3d 1, 7 (1st Cir. 2005) (holding that RFRA argument was forfeited); *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 122 F.3d 443, 449 (7th Cir. 1997) (holding that RFRA argument was waived); *Cochran v. Morris*, 73 F.3d 1310, 1317 n.3 (4th Cir. 1996) (holding that RFRA claim was waived). In the majority's view, however, because appellees' arguments relate to rights protected under RFRA—namely, First Amendment religious rights—appellees have "[i]n substance" relied on RFRA and thus have not, despite their explicit disclaimer, waived its protections. Maj. Op. at 14.

The majority's refusal to recognize appellees' waiver in this case is at odds with RFRA's text, which provides that individuals "*may* assert" a RFRA defense when challenging a substantial burden on their religious rights, not that they *must* assert a RFRA defense when religious rights are burdened. 42 U.S.C. § 2000bb-1(c) (emphasis added). Moreover, the majority's insistence on the viability of a RFRA defense despite appellees' waiver leads the Court to assess RFRA's constitutionality unnecessarily. *See Cutter v. Wilkinson*, 125 S. Ct. 2113, 2118 n.2 (2005) (noting that the Supreme Court has "not had occasion to rule" whether RFRA "remains operative as to the Federal Government"); *see also City of Boerne v. Flores*, 521

---

inapplicable only because it is unconstitutional." Maj. Op. at 12. On the contrary, appellant argues also that RFRA is inapplicable because "[t]here is no substantial burden to the free exercise of religion that could result from a ruling by this court" that appellees violated the ADEA. The majority also contends that "[t]he parties have not briefed the issue of how [RFRA] impacts the merits of this case." Maj. Op. at 24. Both parties, however, have addressed the question of RFRA's relevance to this suit. Appellant argues that RFRA is inapplicable because "[t]here is no substantial burden to the free exercise of religion" in this case, and that, in any event, "application of RFRA to federal law is unconstitutional." Appellees, in turn, argue that RFRA is constitutional but should not affect the outcome of this case.

3

U.S. 507, 532-36 (1997) (invalidating RFRA as applied to state law). By going out of its way to reach this constitutional question, the majority violates one of the "cardinal rules governing the federal courts," namely, "never to anticipate a question of constitutional law in advance of the necessity of deciding it." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985) (citation and internal quotation marks omitted).[2]

The majority's approach is also inconsistent with our case law, which has recognized waiver of statutory religious rights even where a litigant raises claims under the Free Exercise Clause. In *Fifth Avenue Presbyterian Church v. City of New York*, 293 F.3d 570 (2d Cir. 2002), for example, the plaintiff argued before this Court that its religious rights had been violated under both the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA)—a statute virtually identical to RFRA in all aspects relevant to the issue of waiver in the instant case.[3] Although we ruled on the merits of the plaintiff's Free Exercise claim in *Fifth Avenue Presbyterian Church*, we refused to reach the RLUIPA issue because the plaintiff had raised it for the first time on appeal. *See id.* at 576. It is impossible to square our refusal to

---

[2] The other "cardinal rule[]" cited in *Brockett* is that federal courts should "never . . . formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." 472 U.S. at 501 (citation and internal quotation marks omitted).

[3] Like RFRA, RLUIPA prohibits the government from imposing substantial burdens on religion even where the burden results from a neutral law of general applicability. *See* 42 U.S.C. § 2000cc. RLUIPA's remedial provision is virtually identical to RFRA's. *Compare* 42 U.S.C. § 2000cc-2(a) ("A person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."), *with* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."). RLUIPA is simultaneously more broad and more narrow than RFRA, however. RLUIPA is more broad because it still reaches state law. *See Cutter v. Wilkinson*, 125 S. Ct. 2113 (2005). It is more narrow because it applies only to certain government actions involving land use regulations and correctional facilities. *See* 42 U.S.C. §§ 2000cc, 2000cc-1.

consider plaintiff's belated RLUIPA claim in *Fifth Avenue Presbyterian Church* with our refusal to recognize the defendant's *voluntary waiver* of a RFRA defense in the instant case. There is no meaningful difference between RFRA and RLUIPA that could justify such inconsistent results.

The most troublesome aspect of the majority's ruling on waiver, however, is that it fundamentally misconstrues the nature of RFRA and First Amendment rights, and, in doing so, directly contradicts Supreme Court precedent. The majority holds that because appellees invoke the First-Amendment-based "ministerial exception" and allege interference with their rights under the Free Exercise and Establishment Clauses, they have effectively "ask[ed] us to apply the RFRA, but not to mention it." Maj. Op. at 14. This is incorrect. RFRA and the First Amendment do not provide identical protections, and the invocation of First Amendment rights—whether under the Free Exercise or the Establishment Clause—does not necessarily implicate RFRA.

As interpreted by the Supreme Court, for example, the Free Exercise Clause does not normally "inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct," *Cutter*, 125 S. Ct. at 2118 (citing *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 878-82 (1990)), such as the ADEA. RFRA, in contrast, requires strict scrutiny of such laws where the incidental burden on religion is substantial. *See* 42 U.S.C. § 2000bb-1. Indeed, the fact that RFRA's protections sweep more broadly than those of the Free Exercise Clause provided the principal basis for the Supreme Court's holding in *City of Boerne v. Flores* that RFRA could not be considered "preventive" or "remedial" legislation under Section Five of the Fourteenth Amendment. 521 U.S. at 532. The Court found RFRA's protections "so out of proportion to a supposed remedial or preventive object that [the statute]

5

cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.*

Because RFRA went so far beyond what the First Amendment required, the *Boerne* Court

understood the statute as "attempt[ing] a substantive change in constitutional protections"—a

change that Congress was not authorized to make. *Id.* Although *Boerne* does not resolve the

issue of RFRA's constitutionality as applied to federal law, as opposed to state law,[4] the case

does firmly establish that RFRA and the Free Exercise Clause create different standards for the

protection of religion and that RFRA's substantive protections extend far beyond what the Free

Exercise Clause requires. Thus, the majority's suggestion that a claim alleging unconstitutional

interference with the free exercise of religion is "[i]n substance" a RFRA claim flies in the face

of *Boerne*.[5] *See also Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) (noting that

RFRA provides protections beyond those guaranteed by the First Amendment); *Brzonkala v. Va.*

---

[4] I express no view on whether RFRA is constitutional as applied to federal law because it is unnecessary for us to reach this question.

[5] Before *Boerne*, a reasonable argument could have been made that all Free Exercise Clause claims required scrutiny under RFRA. The Tenth Circuit, for example, held in *Werner v. McCotter*, 49 F.3d 1476 (10th Cir. 1995), that RFRA applied to all Free Exercise claims, even where the parties had not raised a claim or defense under the statute. In a subsequent en banc opinion, however, the Tenth Circuit recognized that *Boerne* had undermined its earlier conclusion:

> [I]n *Werner*, decided prior to *City of Boerne*, we were laboring under the false understanding that RFRA "legislatively overturned a number of recent Supreme Court [free exercise] decisions" and that it created a new rule of constitutional law. Thus, we concluded that because the language of RFRA made it applicable to "all cases where free exercise of religion is substantially burdened," its standard ought to control a Free Exercise Clause claim even when not raised. Because the Supreme Court has made clear that the *Werner* court's assumptions about RFRA were faulty, its rationale is no longer convincing.

*United States v. Hardman*, 297 F.3d 1116, 1125 n.15 (10th Cir. 2002) (en banc) (alteration in original) (citations omitted).

*Polytech. Inst. & State Univ.*, 169 F.3d 820, 881-82 (4th Cir. 1999) ("The [RFRA] created a right

of religious exercise that was more generous than that right protected by the Constitution . . . ."),

*aff'd sub nom. United States v. Morrison*, 529 U.S. 598 (2000).

Nor can the majority plausibly argue that appellees' Establishment Clause defense

necessarily implicates RFRA. To satisfy the Establishment Clause: (1) the statute must have "a

secular legislative purpose"; (2) the statue's "principal or primary effect must be one that neither

advances nor inhibits religion"; and (3) "the statute must not foster an excessive government

entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (citation and

internal quotation marks omitted). Thus, like the Free Exercise Clause, the Establishment Clause

imposes less stringent requirements on federal statutes than RFRA, which mandates strict

scrutiny even of neutral, generally applicable laws that incidentally impose substantial burdens

on religion.[6] Furthermore, Congress made clear in enacting RFRA that the statute was not

intended to have any effect on Establishment Clause claims. *See* 42 U.S.C. § 2000bb-4

("Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion

of the First Amendment prohibiting laws respecting the establishment of religion.").

The majority's assertion that appellees have presented a RFRA defense in "all but name"

would be more plausible if something in appellees' briefs indicated that they sought protection

beyond that which the Constitution guarantees. Nothing in the briefs, however, supports such a

conclusion. Appellees' briefs rely heavily on the Free Exercise Clause, the Establishment

---

[6] As recently emphasized by a plurality of Justices, the Supreme Court has not applied the *Lemon* test with much consistency. *See Van Orden v. Perry*, 125 S. Ct. 2854, 2860-61 (2005) (plurality opinion). I am unaware of any application of the Establishment Clause, however, that would invalidate a neutral, generally applicable law imposing an incidental but substantial burden on religion.

7

Clause, and case law interpreting those provisions. Nowhere do they ask that the Court apply a standard stricter than what the First Amendment requires.[7] On the contrary, appellees' supplemental brief explicitly *disclaims* any intent to rely on RFRA.

In sum, because appellees' religious freedom argument relies *only* on the Free Exercise and Establishment Clauses, and because the substance of the protections afforded by these constitutional provisions differs considerably from the protections afforded by RFRA, as interpreted by the Supreme Court, I cannot agree with the majority's conclusion that appellees have "[i]n substance" relied on RFRA. Maj. Op. at 14.

The majority's refusal to recognize appellees' clear waiver of any RFRA defense appears to rest, in part, on its disagreement with the reasons underlying appellees' decision not to pursue such a defense. Specifically, the majority takes issue with appellees' conclusion that RFRA does not apply to suits between private parties. *See* Maj. Op. at 10-11. I am unaware of any other case in which this Court, after ordering supplemental briefing to allow a party to discuss a waivable statutory defense, refused to recognize the party's subsequent waiver of that defense on the ground that the Court disagreed with counsel's reasons for declining to rely on the statute. *Cf. DeLuca v. Lord*, 77 F.3d 578, 588 (2d Cir. 1996) (observing that where defense counsel in a

---

[7] The closest appellees come to making a RFRA argument, as opposed to a First Amendment argument, is a statement in their original brief that application of the ADEA would "substantially burden the free exercise rights of the United Methodist Church." This is the only occasion, however, in which appellees employ RFRA-like language by referring to the alleged intrusion on their rights as a "substantial[] burden," and it is clear from context that the statement formed part of appellees' Establishment Clause argument that application of the ADEA would foster an excessive entanglement with religion. The brief did not purport to raise a separate defense under RFRA. In any event, even if appellees' mention of a "substantial[] burden" in their original brief could be generously construed as an attempt to present a RFRA defense, appellees' subsequent letter-brief makes clear that this was not their intent and that they do not seek to invoke RFRA's protections.

criminal case has made "a considered decision, after investigation, not to pursue" a particular defense, this Court should be "extremely reluctant to second-guess that decision"). Even if such second-guessing of a party's decision not to pursue a particular defense is appropriate in certain limited circumstances, the majority's refusal to acknowledge the clear waiver in this case is improper, given that appellees are adequately represented by counsel and based their waiver on a reasonable interpretation of the law. Indeed, the majority concedes that it is unable to find a single holding that contradicts appellees' view that RFRA does not apply to suits between private parties. *See* Maj. Op. at 25 n.4.

Quoting the Supreme Court, the majority argues that "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Maj. Op. at 14 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). This certainly is true, but it only begs the question of whether the "issue or claim is properly before the court." *Id.* Given appellees' clear indication that they do not seek to rely on RFRA, the applicability of that statute is not before us. The majority's disagreement with appellees' reasoning does not change that fact.

**B.**

Even assuming, *arguendo*, that appellees' clear disclaimer of any RFRA defense does not suffice to waive such a defense, I would find it improper to remand the case to the district court for consideration of RFRA's implications because I disagree with the majority's conclusion regarding RFRA's applicability. RFRA by its terms does not apply to suits between private parties.

9

Two provisions of the statute implicitly limit its application to disputes in which the government is a party. Section 2000bb-1(c) states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a *government*" (emphasis added). In the majority's view, we should read this provision as "broadening, rather than narrowing, the rights of a party asserting the RFRA." Maj. Op. at 11. This interpretation would be questionable even if Section 2000bb-1(c) were the only provision of the statute affecting the question of whether RFRA applies to private suits. When read in conjunction with the rest of the statute, however, it becomes clear that this section reflects Congress's understanding that RFRA claims and defenses would be raised only against the government. For instance, section 2000bb-1(b) of RFRA provides that where a law imposes a substantial burden on religion, the "*government*" must "demonstrate[] . . . that application of the burden" is the least restrictive means of furthering a compelling governmental interest (emphasis added). The statute defines "demonstrate" as "meet[ing] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). Where, as here, the government is not a party, it cannot "go[] forward" with any evidence.[8] In my view, this provision strongly suggests that Congress did not intend RFRA to

---

[8] There are two plausible ways to reconcile section 2000bb-1(b) of RFRA with the majority opinion in this case. The first would be to require government intervention in every private suit where one of the parties asserts that a law has—even incidentally—imposed a substantial burden on religious freedom. Absent a clear statement that Congress intended such a result, it is not the role of this Court to mandate such widespread and automatic federal intervention in lawsuits between private parties. Moreover, were we to read the statute to require government intervention, this would surely underscore the wisdom in recognizing appellees' explicit waiver of any RFRA defense. The second would be to force private parties to bear the burden RFRA places on the government. The statute gives no indication that Congress intended private parties to bear such a burden, nor would it be appropriate to require private parties to satisfy the stringent burden RFRA places on the government.

apply in suits between private parties.[9]

I recognize that according to RFRA's "applicability" section, the statute applies "to all Federal law." 42 U.S.C. § 2000bb-3. This provision, however, is not inconsistent with a finding that the statute does not apply to suits between private parties. Read in conjunction with the rest of the statute, the provision simply requires courts to apply RFRA "to all Federal law" in any lawsuit to which the government is a party.

The majority objects that this interpretation makes RFRA's protections improperly dependent on whether a private party, as opposed to the EEOC, brings suit under the ADEA. "[T]he substance of the ADEA's prohibitions," the majority argues, "cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." Maj. Op. at 11. The majority does not explain, however, why this is so. If RFRA amends all federal statutes as they apply to suits in which the government is a party, then the substance of the ADEA's prohibitions most certainly *can* change depending on who enforces it. Although the majority evidently finds this unsatisfactory from a policy perspective, there is no acceptable reading of the statute that would yield the kind of consistency the majority desires.

Finally, as noted above, the majority concedes that it is unable to locate a single court holding that directly supports its novel application of RFRA to a suit between private parties.

---

[9] All of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party. *See* S. Rep. No. 103-111 (1993); H.R. Rep. 103-88 (1993). The lack of even a single example of a RFRA claim or defense in a suit between private parties in these Reports tends to confirm what is evident from the plain language of the statute: It was not intended to apply to suits between private parties.

*See* Maj. Op. at 25 n.4.[10]  This is telling, for Congress enacted RFRA over twelve years ago.  The plain language of the statute, its legislative history, and its interpretation by courts over the past twelve years demonstrate that RFRA does not apply to suits between private parties.

### C.

Even if appellees had not waived the RFRA defense, and even if RFRA applied to suits between private parties, I would still find it unnecessary to reach the RFRA issue, or to analyze the statute's constitutionality, because Supreme Court and Second Circuit precedent compel the conclusion that the ADEA does not apply to this dispute.  Because the ADEA does not apply, there is no "substantial burden" on religion, and RFRA, even if constitutional, is irrelevant.

In analyzing the ADEA's applicability to this case, we find guidance in the principles articulated by the Supreme Court in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979).  To determine whether the National Labor Relations Act (NLRA) authorized the National Labor Relations Board to regulate labor relations between a parochial school and its faculty, the *Catholic Bishop* Court considered two principal questions.  *See id.* at 501.  First, it considered whether this application of the NLRA raised First Amendment concerns.  The Court concluded that it did, explaining that judicial oversight of labor relations at a parochial school would risk excessive entanglement between secular and religious authorities in violation of the Establishment Clause.  *Id.* at 501-04.  Second, the Court examined whether Congress expressed an intention to apply the statute to religious institutions despite these constitutional concerns.  Because the Court discerned no such congressional intent, it construed the NLRA in a manner

---

[10] The majority cites dicta from district court opinions in Indiana and Arizona but concedes that those courts "assumed" that RFRA could apply without analyzing the issue in any depth.  *See* Maj. Op. at 25-26 n.4.

12

that avoided the constitutional difficulty, holding that the statute did not apply to labor disputes between parochial schools and their employees.[11] *Id.* at 504-07; *see id.* at 500 (citing the longstanding principle that acts of Congress "ought not be construed to violate the Constitution if any other possible construction remains available") (citing *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)); *see also Hsu By & Through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 854 (2d Cir. 1996) (noting this Court's "consistent . . . practice of avoiding constitutional questions where possible").

Distinguishing *Catholic Bishop*, we concluded in *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166 (2d Cir. 1993), that the ADEA, unlike the NRLA, generally applies to religious institutions. *Id.* at 172. Specifically, we held that a former lay teacher could bring an ADEA action against a parochial school even though the teacher performed some religious duties. *Id.* at 168-72. In so holding, we observed that the ADEA, unlike the NRLA, does not pose the risk of "extensive or continuous administrative or judicial intrusion into the functions of religious institutions." *Id.* at 170. Instead, the ADEA involves "'routine regulatory interaction'" and requires "'no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring [or] close administrative contact between secular and religious bodies.'" *Id.* at 170 (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 696-97 (1989) (internal quotation marks omitted)); *see also id.* ("In age discrimination cases, the EEOC's authority extends only to the investigation and attempted conciliation or resolution of individual or group complaints; it is limited in time and scope." (citation and internal quotation marks omitted)).

---

[11] The Court reached this conclusion even though the NLRA did not expressly include religious institutions in its list of eight types of employers exempted from the act. *See Catholic Bishop*, 440 U.S. at 511 (Brennan, J., dissenting) (citing 29 U.S.C. § 152(2)).

These factors distinguished the ADEA from the NLRA.[12]

As a general rule, federal courts may decide civil disputes, including employment discrimination disputes, between a religious institution and its employees without violating the First Amendment. *See Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 99-100 (2d Cir. 2002) (citing *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999); *Gargano v. Diocese of Rockville Ctr.*, 80 F.3d 87, 90 (2d Cir. 1996); *DeMarco*, 4 F.3d at 172; *cf. Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes)." (internal quotation marks omitted)). The instant case, however, presents the more difficult question of whether this general rule applies in the narrow context of a forced-retirement dispute between a religious body and a member of its clergy.

As we noted in *DeMarco*, the relationship between a religious institution and certain of its employees may be "so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause." *Id.* at 172. This risk is particularly serious in employment disputes between religious institutions and their spiritual leaders where the enforcement of statutes like the ADEA might threaten the "power of religious bodies to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Serbian E. Orthodox Diocese for the U.S. &*

---

[12] As discussed below, *DeMarco* also found the ADEA distinguishable from the NLRA because Congress clearly intended the ADEA to apply to religious institutions. *See* 4 F.3d at 172.

14

*Can. v. Milivojevich*, 426 U.S. 696, 722 (1976) (internal quotation marks and alteration omitted).

"A church's selection of its own clergy" is a "core matter of ecclesiastical self-governance" at the "heart" of the church's religious mission. *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999). Federal court entanglement in matters as fundamental as a religious institution's selection or dismissal of its spiritual leaders risks an unconstitutional "trespass[] on the most spiritually intimate grounds of a religious community's existence." *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000).

In light of these serious constitutional concerns, we must ask whether Congress intended to apply the ADEA to religious institutions in their selection of spiritual leaders. *See Catholic Bishop*, 440 U.S. at 504. We concluded in *DeMarco* that Congress "implicitly expressed an intention to apply the ADEA to religious institutions." 4 F.3d at 172. We based this conclusion, in part, on the ADEA's similarity to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. "Given that Congress intended to apply Title VII to religious institutions, and that Congress modelled the ADEA's coverage upon that of Title VII," we were "convinced that [Congress] also intended to apply the ADEA to such institutions." *Id.* at 173.

*DeMarco*, however, involved an employment dispute between a religious institution and a math teacher who, despite having some religious duties, served primarily non-religious functions in a parochial school. Here, in contrast, the dispute is between a minister with primarily religious duties and a church that no longer wishes him to serve as pastor of a congregation. That Congress intended the ADEA and Title VII to apply under the circumstances described in *DeMarco* does not indicate an intention that those statutes should apply in all circumstances. Nothing in the text, structure, or legislative history of the ADEA indicates an intention to extend

15

its provisions to a religious body's selection or dismissal of its ministers. *See Catholic Bishop*, 440 U.S. at 504; *DeMarco*, 4 F.3d at 169, 172-73. Accordingly, I believe that the ADEA does not apply to the case at bar.[13] Because the ADEA does not apply, there is no substantial burden on religion that could trigger RFRA.

The majority suggests that reliance on *Catholic Bishop* (and *DeMarco*) is unwarranted, because "RFRA [is] the full expression of Congress's intent with regard to the religion-related issues before us and displace[s] earlier judge-made doctrines that might have been used to ameliorate the ADEA's impact on religious organizations and activities." Maj. Op. at 8. Even if RFRA applied to private suits and had not been waived in this case, I would disagree with the majority's suggestion that the statute completely displaces the *Catholic Bishop* analysis. Although the *Catholic Bishop* rule and RFRA serve similar purposes, they require courts to undertake different inquiries. *See Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1347 (D.C. Cir.

---

[13] This conclusion is consistent with the holdings of at least seven of our sister Circuits, which have adopted a limited "ministerial exception" that exempts religious institutions on First Amendment grounds from employment discrimination suits brought by clergy members or other employees serving primarily religious roles. *See Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d at 800, 805; *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000); *Bollard*, 196 F.3d at 949; *Combs v. Central Tex. Annual Conf. of the United Methodist Church*, 173 F.3d 343, 351 (5th Cir. 1999); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996); *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 (8th Cir. 1991). Most circuits have reached the constitutional question directly and have held that the First Amendment bars adjudication of ministerial employment disputes. *See, e.g.*, *Gellington*, 203 F.3d at 1304; *Combs*; 173 F.3d at 351; *Young*, 21 F.3d at 187. Here, in contrast, I would apply *Catholic Bishop*'s principles of statutory construction so as to avoid making definitive pronouncements on the constitutional question. *See* 440 U.S. at 507; *see also Scharon*, 929 F.2d at 361-63 (applying the *Catholic Bishop* analysis to an employment discrimination action brought by a priest). Despite this difference, my conclusion is substantially the same as that of other Circuits: courts may not adjudicate employment discrimination lawsuits brought by clergy members challenging a religious body's refusal to select or retain them as spiritual leaders.

2002) (holding that the court need not address a university's RFRA argument because the university was entitled to an exemption under *Catholic Bishop*, and observing that "RFRA presents a separate inquiry from *Catholic Bishop*"). *Catholic Bishop* requires courts, where possible, to interpret statutes in ways that would avoid raising serious constitutional concerns. In some cases, no such interpretation will be reasonably available. In those cases, RFRA may provide an independent avenue both for protecting religious rights and for avoiding definitive resolution of constitutional questions. Thus, RFRA should not be read to supplant the *Catholic Bishop* inquiry, but to supplement it. Indeed, given that RFRA's express purpose was to enhance protection for religion, *see* 42 U.S.C. § 2000bb, it makes little sense to read the statute as eliminating the protection afforded by the *Catholic Bishop* rule.

### D.

I believe that a remand is a wasteful expenditure of judicial resources and an unnecessary and uninvited burden on the parties. The district court is in no better position than we are to decide either the statutory or constitutional questions presented in this case. In my view, the most appropriate disposition of this case would be to affirm the district court's dismissal of appellant's claims on the ground that the ADEA does not apply to employment suits brought against religious institutions by their spiritual leaders. Because the majority's contrary approach disregards a clear and voluntary waiver, conflicts with RFRA's text and with binding precedent, and unnecessarily resolves a contested constitutional question, I respectfully dissent.[14]

---

[14] I take no issue, however, with the analysis of the ADEA's procedural requirements in section (a) of the majority's opinion. *See* Maj. Op. at 5-8.

17