

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-24-2006

# Petruska v. Gannon Univ

Precedential or Non-Precedential: Precedential

Docket No. 05-1222

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Petruska v. Gannon Univ" (2006). *2006 Decisions.* Paper 991.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/991

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-1222

———————

LYNETTE M. PETRUSKA,
*Appellant*

v.

GANNON UNIVERSITY; THE BOARD OF TRUSTEES
OF GANNON UNIVERSITY; WILLIAM I. ALFORD, II;
ROBERT H. ALLSHOUSE; JOSEPH F. ALLISON;
MICHAEL P. ALLISON, REV.; JAMES A. BALDAUF;
L. SCOTT BARNARD; GEORGE J. BEHRINGER;
ARNOLD E. BERGQUIST; LAWRENCE E. BRANDT,
REV. MSGR.; ROBERT L. BRUGGER, REV. MSGR.;
DONALD M. CARLSON; DANIEL C. CARNEVAL, D.O.;
STEPHANIE DOMITROVICH, HON.; THOMAS L.
DOOLIN; JAMES J. DURATZ; ANTOINE M.
GARIBALDI; THOMAS C. GUELCHER; WILLIAM M.
HILBERT, SR.; BRIAN J. JACKMAN; JAMES W. KEIM,
JR.; MARY RITA KUHN, SR., SSJ; THOMAS J. LOFTUS;
ANNE C. MCCALLION; JOSEPH T. MESSINA;
MICHAEL J. NUTTALL; JOHN E. PAGANIE; DENISE
ILLIG ROBISON; JAMES J. RUTKOWSKI, JR.; JAMES A.
SCHAFFNER; HELEN M. SCHILLING, M.D., D.D.S.;
JOHN M. SCHULTZ, VERY REV.; ROBERT J. SMITH,
REV. MSGR.; LAWRENCE T. SPEICE, REV. MSGR.;

WILLIAM C. SPRINGER; JAMES G. TOOHEY; DONALD
W. TRAUTMAN, BISHOP; ANASTASIA VALIMONT, SR.
SSJ; RICARDA VINCENT, SR. SSJ; MELVIN
WITHERSPOON; ALL OTHER KNOWN AND
UNKNOWN MEMBERS OF THE BOARD OF TRUSTEES
OF GANNON UNIVERSITY DURING THE TENURE OF
DONALD W. TRAUTMAN, as members of the Board of
Trustees of Gannon University; DAVID RUBINO, MSGR.,
in their individual and official capacities; NICHOLAS
ROUCH, REV., in their individual and official capacities

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. Action No. 04-80)
District Judge: Honorable Sean J. McLaughlin

Argued October 20, 2005
Before: SMITH, BECKER, and NYGAARD, *Circuit Judges*[1]

( Filed: May 24, 2006)

C. John Pleban (ARGUED)
Pleban & Associates
2010 South Big Bend Boulevard
St. Louis, Missouri 63117

---

[1]The Honorable Edward R. Becker authored this opinion,
but died before it was released.

2

*Attorney for Appellant*

Evan C. Rudert (ARGUED)
Elderkin, Martin, Kelly & Messina
150 East 8th Street
Erie, Pennsylvania 16501

Kenneth W. Wargo
Frank L. Kroto, Jr. (ARGUED)
Quinn, Buseck, Leemhuis, Toohey & Kroto
2222 West Grandview Boulevard
Erie, Pennsylvania 16506-4508
*Attorneys for Appellees*

Phillip J. Murren
Ball, Murren & Connell
2303 Market Street
Camp Hill, Pennsylvania 17011
*Attorney for Amicus-Appellee*

---

OPINION OF THE COURT

---

BECKER, *Circuit Judge*.

The ministerial exception to Title VII, a doctrine adopted

by numerous courts, exempts religious organizations from

3

employment discrimination suits brought by ministers. Grounded in the Establishment and Free Exercise Clauses of the United States Constitution, the ministerial exception was created to protect church autonomy and avoid entangling government in religious affairs. This case requires us to determine the reach of the ministerial exception in this Circuit.

We adopt a carefully tailored version of the ministerial exception. Where otherwise illegal discrimination is based on religious belief, religious doctrine, or the internal regulations of a church, the First Amendment exempts religious institutions from Title VII. In such cases, restricting a church's freedom to select its ministers would violate the Free Exercise Clause by inhibiting the church's ability to express its beliefs and put them into practice. Furthermore, questions about religious matters would pervade litigation, entangling courts in ecclesiastical matters and violating the Establishment Clause.

But where a church discriminates for reasons unrelated to religion, we hold that the Constitution does not foreclose Title VII suits. Employment discrimination unconnected to religious belief, religious doctrine, or the internal regulations of a church is simply the exercise of intolerance, not the free exercise of religion that the Constitution protects. Furthermore, in adjudicating suits that do not involve religious rationales for employment action, courts need not consider questions of religious belief, religious doctrine, or internal church regulation, a process that would violate the Establishment Clause by entangling courts in religious affairs.

Lynette Petruska brings suit against Gannon University, a Catholic institution, and various Gannon University officials (collectively, "Gannon"). She alleges in replete detail that Gannon, acting without any religious or ecclesiastical motivation, demoted her because she is a woman and because

5

she opposed sexual harassment by Gannon officials.

The District Court granted Gannon's motion to dismiss Petruska's Title VII claims under Federal Rule of Civil Procedure 12(b)(1), reasoning that the ministerial exception barred these claims. As we explain below, a motion such as Gannon's is more properly dealt with under Rule 12(b)(6), which requires us to treat Petruska's allegations as true.[2] Accordingly, we assume that Gannon lacked a religious rationale for Petruska's demotion. We will therefore reverse the dismissal of her Title VII claims.

Petruska also asserts state law causes of action for breach of contract, fraudulent misrepresentation, negligent supervision and retention, and civil conspiracy. The District Court dismissed these claims under Rule 12(b)(1), reasoning that the

---

[2]At all events, the District Court did not engage in factfinding, and what we deal with here is functionally a Rule 12(b)(6) dismissal.

6

religion clauses removed jurisdiction. Reviewing the dismissal under Rule 12(b)(6), we cannot conclude at this stage of litigation that these claims will require an examination of matters of faith, doctrine, or internal church regulation. Therefore, they are not barred by the religion clauses.[3]

## I.

The facts set forth below are drawn from Petruska's First Amended Complaint, which we must accept as true for purposes of a Rule 12(b)(6) motion. Gannon University is a Catholic diocesan college located in Erie, Pennsylvania. Gannon hired Petruska as the university's Director of Social Concerns in July of 1997. Petruska was appointed permanent chaplain on July 1, 1999. She was to be the first female chaplain in Gannon's

---

[3]We will reverse the dismissal of Petruska's state law claims, with the exception of the fraudulent misrepresentation claim. This claim was not pled with sufficient particularity under Federal Rule of Civil Procedure 9(b).

history.

Prior to accepting the position, Petruska sought assurances from Gannon's President, David Rubino, that she would not be replaced when Reverend Nicholas Rouch, a former Gannon chaplain who had left to study in Rome, returned, or when another male became available. She submits that she requested these assurances due to: (1) a policy or practice of gender discrimination at Gannon; (2) her knowledge that the position of chaplain had been promised to Rouch upon his return; and (3) the reputation of Bishop Donald Trautman, chair of Gannon's Board of Directors, for being unable to work with women and for removing women from leadership positions. Rubino assured Petruska that decisions regarding her tenure as chaplain would be based solely on her performance, and not her gender.

Petruska's role as chaplain was essentially that of a vice

president. She served in a cabinet-level position on the President's staff and was co-chair of Gannon's Catholic Identity Task Force. Petruska's religious duties included holding prayer services and planning liturgies.

Several months after Petruska's appointment, in March of 2000, Rubino was forced to take a leave of absence when he was accused of having a sexual affair with a female subordinate. Rubino admitted the affair to various university officials. Thereafter, a different female employee accused Rubino of sexual harassment. Petruska was instrumental in bringing this claim to the attention of Trautman and Provost Thomas Ostrowski. Rubino resigned in May of 2000 and Ostrowski was appointed acting President. At Trautman's behest, Gannon then began a campaign to conceal Rubino's misconduct.

Petruska served on Gannon's Sexual Harassment Committee as the university was in the process of revising its

9

sexual harassment policy. Although several of Gannon's lawyers advocated limiting the time period in which grievances could be filed, Petruska opposed this proposal, and her view ultimately prevailed. Petruska was also involved in preparing a report that criticized Gannon's discrimination and harassment policies. Despite a request from Gannon's President, the committee that prepared the report refused to modify portions criticizing the university.[4]

In July of 2000, Ostrowski, then serving as acting President, met with Trautman, as well as Rouch, who had returned from Rome. Trautman told Ostrowski to place the Chaplain's Division under the control of Rouch, thereby making Petruska Rouch's subordinate. Ostrowski refused.

Ostrowski told Petruska about Trautman's plan and asked

---

[4]Petruska also alleges that she challenged the propriety of allowing a former Gannon priest, who was removed due to sexual misconduct toward students, from returning to campus.

10

Petruska how she would respond if the Chaplain's Division were placed under Rouch's leadership. According to Petruska, Ostrowski conceded that the proposed action was being taken *solely* on the basis of Petruska's gender. Later, Ostrowski "made it clear to [Petruska] that Trautman and Rouch would never let her remain Chaplain at Gannon because of her gender."

In a January 2001 meeting, Ostrowski was informed that once a new President was appointed, Trautman intended to "clean house" by removing three high-ranking university officials, all of whom were female: Petruska, the Executive Director of Admissions, and the acting Provost. In May of 2001, Antoine Garibaldi was appointed President of Gannon. As President, Garibaldi required Rouch's approval of all important decisions that Petruska, as chaplain, ordinarily made.

In August of 2002, Garibaldi notified Petruska that he had decided to restructure the university, that she would be

11

removed from the President's Staff, and that the Chaplain's Division would report to Rouch. The effect of the restructuring was to make Rouch Petruska's boss.

After a series of events convinced Petruska that she was on the verge of being fired, she tendered her resignation in October of 2002. After Petruska's resignation, Rouch repeatedly told Gannon students and staff that a woman would not be considered to replace Petruska as chaplain.

Petruska filed this action in the District Court for the Western District of Pennsylvania against Gannon University, Gannon's Board of Trustees, and various Gannon officials. Petruska asserted six claims, naming some or all of the defendants in the following counts: (1) Title VII sex discrimination; (2) Title VII retaliation; (3) fraudulent misrepresentation; (4) civil conspiracy; (5) breach of contract; and (6) negligent supervision and retention. The District Court

12

granted Gannon's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), concluding that the religion clauses barred adjudication of Petruska's claims.

## II.

Federal courts have long struggled to balance state regulation and religious freedom. *See, e.g.*, *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976). In the employment context, the source of this conflict is readily apparent. The government possesses a vital interest in promoting equality in the workplace, but this interest at times collides with the constitutional right of a religious institution to be free from excessive state interference.[5] In balancing these

---

[5]*Compare Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("Of course churches are not — and should not be — above the law."), *with Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999) ("[T]he Free Exercise Clause protects the power of religious organizations 'to decide for themselves, free from state interference, matters of church government as well as those of faith

competing interests, several courts have applied the ministerial exception, which exempts religious institutions from Title VII suits brought by employees charged with ministerial duties.

In *McClure v. Salvation Army*, 460 F.2d 553, 555 (5th Cir. 1972), the seminal case on the ministerial exception, a female officer of the Salvation Army alleged that she received a lower salary and fewer benefits than male employees, and that she was discharged for complaining of these disparities. The Fifth Circuit held that the First Amendment barred the former officer's claim, stating:

> The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.

and doctrine.'") (quoting *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church of N. Am.*, 344 U.S. 94, 116 (1952)).

14

*Id.* at 558-59.

Seven federal circuits now recognize the ministerial exception.[6] Six have held that the exception applies regardless of whether the motive for the discrimination is religious in nature.[7] In evaluating whether a particular employee's suit is

---

[6]*See EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000); *Rayburn*, 772 F.2d 1164; *McClure*, 460 F.2d 553; *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003); *Young v. Northern Illinois Conf. of United Methodist Church*, 21 F.3d 184 (7th Cir. 1994); *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991); *Werft v. Desert Southwest Annual Conf. of the United Methodist Church*, 377 F.3d 1099 (9th Cir. 2004); *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299 (11th Cir. 2000); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996).

[7]*See E.E.O.C. v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) ("The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision. The church need not, for example, proffer any religious justification for its decision . . ."); *Combs v. Central Texas Annual Conference of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999); *Young*, 21 F.3d at 186; *Alicea-Hernandez*, 320 F.3d at 703; *Scharon*, 929 F.2d at 363; *Werft*, 377 F.3d at 1103; *Catholic Univ of Am.*, 83 F.3d at 464-65.

15

subject to the ministerial exception, the essential question is whether the employee's "primary functions" serve the "spiritual and pastoral mission" of a church. *E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1986).[8]

Courts have derived the ministerial exception both through direct constitutional analysis and by applying the doctrine that ambiguous statutes must be interpreted to avoid significant constitutional risks. The Fourth Circuit determined that Title VII applies by its clear language to ministerial employment decisions. *See Rayburn v. Gen. Conf. of Seventh-*

Although the Eleventh Circuit has recognized the ministerial exception, *see Gellington*, 203 F.3d 1299, it does not appear to have directly addressed whether the exception applies without regard to motive.

[8]*See also Alicea-Hernandez*, 320 F.3d at 703 (applying the ministerial exception to a Hispanic Communications Manager who functioned as a "press secretary" for the church); *Starkman v. Evans*, 198 F.3d 173, 175-76 (5th Cir. 1999) (holding that a choir director at a Methodist church was a minister for purposes of First Amendment analysis).

16

*Day Adventists*, 772 F.2d 1164, 1165-67 (4th Cir. 1985). The Court therefore reached the direct constitutional question and held that the religion clauses bar employment suits by ministers. *See id.* at 1165-72; *see also Scharon*, 929 F.2d at 361-63. *McClure*, however, applied the constitutional avoidance doctrine and reasoned that Title VII does not apply unambiguously to the hiring and firing of ministers. *See* 460 F.2d at 560-61.

Courts have also derived the ministerial exception from different constitutional provisions. Some have concluded that the Free Exercise Clause commands the exception, whereas others have opined that the exception is rooted in both the Free Exercise Clause and the Establishment Clause.[9]

---

[9]*See McClure*, 460 F.2d at 560 (Free Exercise Clause); *Alicea-Hernandez*, 320 F.3d at 702-03 (Free Exercise Clause); *Young*, 21 F.3d at 186 (Free Exercise Clause), *Werft*, 377 F.3d at 1101 (both religion clauses); *Rayburn*, 772 F.2d at 1167-72 (both religion clauses); *Scharon*, 929 F.2d at 361-63 (both religion clauses).

17

Our survey of Court of Appeals decisions has revealed three explanations of why the Constitution may require the ministerial exception. We delineate these rationales now and later consider whether they apply to this case. First, some courts have articulated a "government scrutiny" rationale, which holds that the ministerial exception is necessary to avoid government probing or examination of a church's affairs.[10] The "government scrutiny" rationale is based on the Establishment Clause, which commands the government to avoid entanglement

---

[10]*See, e.g.*, *Rayburn*, 772 F.2d at 1171 ("Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers."); *Scharon*, 929 F.2d at 363 ("It is not only the conclusions that may be reached ... which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry.") (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)).

in religious matters.[11]

Second, some courts have advanced a "selection of clergy" rationale. Under this theory, religious institutions should be free to select their own ministers, and the government should have no role in this process. Whereas the "government scrutiny" rationale focuses on the process of judicial inquiry, the "selection of clergy" rationale aims to prevent the government from controlling actual employment *decisions*.[12] While our sister circuits have grounded the "selection of clergy" argument in both the Free Exercise Clause and the Establishment Clause,[13]

---

[11]*See Rayburn*, 772 F.2d at 1171 ("[P]ervasive monitoring by public authorities ... infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement.") (quoting *Aguilar v. Felton*, 473 U.S. 402, 413 (1985)) (alterations in original); *see generally Lemon v. Kurtzman*, 403 U.S. 602 (1971).

[12]*See, e.g., Werft*, 377 F.3d at 1101 ("[B]ecause clergy represent a religious institution to the people, a religious institution must retain unfettered freedom in its choice of clergy.").

[13]*Rayburn*, for example, derives the "selection of clergy" argument from both clauses. *See* 772 F.2d at 1168 ("Any attempt by government to restrict a church's free choice of its leaders . . . constitutes a burden on the church's *free exercise* rights.") (emphasis added); *id* at 1171 ("Bureaucratic suggestion in

it appears to flow more naturally from the Free Exercise Clause, because it focuses on the right of a church to put its beliefs into practice through its choice of ministers.

Finally, some courts have based the ministerial exception on an "inquiry into religious doctrine" rationale. Under this justification, the ministerial exception is necessary to prevent courts from resolving religious questions, which lie beyond judicial competence and authority. The Eighth Circuit has opined that "to review [ministerial employment] decisions would require the courts to determine the meaning of religious doctrine and canonical law." *Scharon*, 929 F.2d at 363.[14] The "inquiry into religious doctrine" rationale is more narrow than the "government scrutiny" rationale. The "government

employment decisions of a pastoral character, in contravention of a church's own perception of its needs and purposes, would constitute unprecedented *entanglement* with religious authority. . .") (emphasis added).

[14]*See also Combs*, 173 F.3d at 350 ("[S]ecular authorities would be involved in evaluating or interpreting religious doctrine."); *Simpson*, 494 F.2d at 493 ("[C]ivil courts are barred by the First Amendment from determining ecclesiastical questions.").

20

scrutiny" rationale is concerned with any intrusion into the internal affairs of a church, regardless of whether the government intrudes in a manner that requires it to resolve religious questions. The "inquiry into religious doctrine" rationale has been framed both in Free Exercise and Establishment Clause terms.[15]

This Court has not had occasion in prior cases to adopt or reject the ministerial exception. In two cases, however, we have considered employment claims brought against religious organizations by non-ministerial employees. In *Little v. Wuerl*, 929 F.2d 944, 946 (3d Cir. 1991), a Catholic school refused to rehire a teacher because she remarried without following the proper canonical process to validate her second marriage. We concluded that §§ 702 and 703(e)(1) of Title VII, 42 U.S.C. §§

---

[15]*See Scharon*, 929 F.2d at 363 (stating that to decide questions of religious doctrine and law would violate the Free Exercise Clause); *Gellington*, 203 F.3d at 1304 (stating that an employment suit would involve the government "in questions of religious doctrine, polity, and practice" in violation of the Establishment Clause (quoting *Jones v. Wolf*, 443 U.S. 595, 603 (1979)).

2000e-1 and 2000e-2(e)(1), exempt "conduct [that] does not conform to [religious] mores." *Id.* at 945. Therefore, we held that the school could decline to rehire the plaintiff on the basis of her remarriage. *Id.* at 951.

The ministerial exception did not apply in *Little* both because the plaintiff was not a ministerial employee and because she was discharged on the basis of religion, thus triggering statutory exemptions under Title VII. Nonetheless, we did mention the ministerial exception in dicta: "[C]ourts have consistently found that Title VII does not apply to the relationship between ministers and the religious organizations that employ them, even where discrimination is alleged on the basis of race or sex." *Id.* at 947 (citing *McClure* and *Rayburn*).

In *Geary v. Visitation of the Blessed Virgin Mary Parish School*, 7 F.3d 324 (3d Cir. 1993), a teacher brought suit against a parochial school under the ADEA. Like *Little*, *Geary* involved a non-ministerial employee. However, whereas the plaintiff in *Little* brought a claim for religious

22

discrimination, the plaintiff in *Geary* sued for age discrimination. *Id.* at 328. Specifically, the plaintiff contended that she was fired due to her age, while the school asserted that she was fired for marrying a divorced man. *Id.* at 326. We concluded that the plaintiff's suit did not "present a significant risk" of infringing the First Amendment. *Id.* at 331.

With these precedents in mind, we turn to Petruska's claims, and the procedural posture in which they come to us.

### III.

The District Court dismissed Petruska's claims under Federal Rule of Civil Procedure 12(b)(1). While some courts consider the ministerial exception to be jurisdictional in nature, and therefore view a motion to dismiss under Rule 12(b)(1) as the proper mechanism for asserting the exception,[16] other courts opine that where the exception applies, the plaintiff fails to state

---

[16]*See, e.g.*, *Alicea-Hernandez*, 320 F.3d at 701; *Young*, 21 F.3d at 185.

a claim under Rule 12(b)(6).[17]  For the reasons stated in the

margin, we conclude that the ministerial exception is properly

raised in a Rule 12(b)(6) motion.[18]  We therefore review

[17]*See, e.g.*, *Werft*, 377 F.3d at 1100; *Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990).

[18]At issue in a 12(b)(1) motion is the court's "very power to hear the case." *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  A 12(b)(6) motion, by contrast, tests the legal sufficiency of a plaintiff's claim.  The question is whether the plaintiff has stated a cause of action.  In that respect, as the Tenth Circuit noted in *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 654 (10th Cir. 2002), the assertion of the ministerial exception—or, in that case, the "church autonomy doctrine"—is akin to a government official's defense of qualified immunity, which is often raised in a 12(b)(6) motion. *Id*. The exception may bar the plaintiff's causes of action, but it does not affect the court's authority to consider them.

Although *McClure*, the case that first articulated the ministerial exception, spoke of it in jurisdictional terms, the Court based the exception on an interpretation of § 703 of Title VII, 42 U.S.C. § 2000e-2, the provision under which the plaintiff brought suit.  460 F.2d at 555-56, 560-61.  Section 703 does not confer jurisdiction but instead creates a right of action for sex discrimination. Because the ministerial exception is a limitation on § 703, and because § 703 creates a right of action, it follows that the ministerial exception restricts a plaintiff's right of action, not a court's jurisdiction.

Moreover, a federal court undoubtedly has the authority to review claims arising under federal law.  *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004) ("Federal question jurisdiction is statutorily established, giving district courts

Petruska's complaint under that rule.

So construing the motion to dismiss, we have jurisdiction under 28 U.S.C. § 1291. *See Jordan v. Fox Rothschild O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). Our review is plenary. *Id.* Petruska's allegations, and all reasonable inferences that can be drawn from them, must be deemed true, and must be viewed in the light most favorable to her. *See Evancho v. Fisher*, 423 F.3d 347, 350-351 (3d Cir. 2005).

Petruska's complaint alleges that she was demoted because she is a woman. The complaint states that Gannon's acting President, Thomas Ostrowski, told Petruska that she was to be demoted "*solely* on the basis of her gender." (emphasis added).

When a religious organization fires or demotes a woman on the basis of sex, it may be acting according to religious belief, religious doctrine, or church regulation (consider, for

'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'").

25

example, the Catholic Church's prohibition of female priests). In such a case, the religious organization would be immune from a Title VII suit. But a religious institution might also fire a woman because the individuals making the decision are, simply put, sexist. Religious doctrine and internal church regulation play no role in such a decision.

Considering the complaint in the light most favorable to Petruska, we must conclude that this is the latter type of case: Under the pleadings, Petruska was fired due to sexism unmoored from religious principle. Nothing in the complaint suggests that, as a matter of Catholic doctrine, women cannot serve as university chaplains; indeed, Petruska was hired as Gannon's chaplain. The complaint alleges that sexism and sexual harassment at Gannon are rampant and points to no religious justification for this alleged state of affairs. Gannon's former President, David Rubino, admitted to having an affair with a subordinate. Another female employee accused Rubino of sexual harassment, forcing Gannon to settle her claim. The

complaint further states that Gannon has a custom or practice of sex discrimination and that Gannon undertook a campaign to cover up the former President's sexual misconduct. Petruska alleges that Trautman has removed women from leadership positions in his Diocese due to their sex and that he has a reputation for being unable to work with women.

This case plainly presents the question whether a ministerial employee may bring suit under Title VII where the religious institution lacks a rationale for the employment action that is grounded in faith, doctrine, or internal regulation.[19] We now turn to this question.

------

[19]Gannon's creation of a Vice President for Mission and Ministry position may be viewed as a decision pursuant to an internal regulation. Presumably, the new position was somehow written into Gannon's policies. However, we construe Petruska's complaint to allege that Gannon violated Title VII not by *creating* the position but by *installing* Rouch into the position, despite the fact that the new position gave duties to Rouch that formerly belonged to Petruska. After all, Title VII regulates not an organization's power to chose its own structure or to create new positions but its ability to install particular individuals into those positions. Gannon has cited no explanation grounded in religious belief, religious doctrine, or internal regulation for the decision to give to Rouch what had, in effect, been Petruska's job.

27

**A.**

Where a federal statute poses "a significant risk of infringing the First Amendment," we must consider whether there is "a permissible construction of the statute that avoids that risk." *Geary*, 7 F.3d at 327; *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979). If there is such a permissible construction, we adopt it, and do not reach the constitutional question. *See Geary*, 7 F.3d at 327.

Although *McClure*, 460 F.2d at 560-61, held that Title VII could be fairly construed not to apply to ministerial employees, the Fourth Circuit has held that Congress clearly expressed an intent to bring ministers within the reach of Title VII. *See Rayburn*, 772 F.2d at 1166. The plain language of Title VII's prohibition on sex discrimination extends to the employment of ministers by religious institutions.[20] Likewise,

---

[20]Section 703 of Title VII provides:

It shall be an unlawful employment practice for an employer—

28

Title VII's retaliation provision, under which Petruska also brings suit, contains no exception for religious organizations. 42 U.S.C. § 2000e-3(a).

Furthermore, as the Fourth Circuit noted in *Rayburn*, § 702 of Title VII contains a limited exemption for "a religious corporation, association, educational institution, or society." 772 F.2d at 1166. However, the exemption is restricted to the decision to employ "individuals of a particular religion" to perform work connected with the organization's activities. *See id.*; 42 U.S.C. § 2000e-1. Thus, Congress gave churches the explicit right to discriminate on the basis of religion, but declined to create a right to discriminate on the basis of sex or to retaliate against an employee for complaining of sex discrimination. *See Rayburn*, 772 F.2d at 1166-67.

---

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

42 U.S.C. § 2000e-2.

*Rayburn* also concluded that Title VII's "legislative history reinforces the plain meaning of the statutory text." *Id.* at 1167. Congress repeatedly considered and recalibrated the limited exemption for religious employers, but never gave such employers the power to discriminate on the basis of sex. As originally passed by the House in 1964, Title VII entirely exempted religious corporations, associations, or societies.[21] The final version, however, limited the exemption to discrimination on the basis of religion against employees involved in "religious activities."[22] In 1972, the exemption was broadened by deleting the word "religious" before "activities."[23] However, the Senate rejected a proposal that would have expanded the exemption so far as to prohibit all Title VII suits

---

[21]*Rayburn*, 772 F.2d at 1167. (citing H.R. Rep. No. 914, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S. Cong. & Admin. News 2355, 2391, 2402).

[22]*Id.* (citing P.L. 88-352, Title VII, § 702, 78 Stat. 241, 255 (July 2, 1964), *reprinted in* 1964 U.S. Cong. & Admin. News 287, 304).

[23]*Id.* (citing P.L. 92-261 § 3, 86 Stat. 103-104 (March 24, 1972)).

against religious organizations.[24] Finally, the section-by-section analysis of the Equal Employment Opportunity Act of 1972 stated that religious organizations "remain subject to the provisions of Title VII with regard to race, color, *sex* or national origin."[25]

In light of the foregoing analysis, we agree with the Fourth Circuit that the ministerial exception must derive directly from the Constitution, and not from Title VII.

**B.**

Under the terms of Title VII, a woman denied admission to the priesthood could sue the Catholic Church for sex discrimination. However, it is clear that Title VII cannot constitutionally extend to discrimination based on religious

---

[24]*See* Subcommittee on Labor of the Committee on Labor and Public Welfare of the United States Senate, Legislative History of the Equal Employment Opportunity Act of 1972 (Comm. Print 1972), at 376, 881, 1229-1230, 1258-1260, *cited in Rayburn*, 772 F.2d at 1167.

[25]Section-by-Section Analysis of H.R. 1746, the Equal Employment Opportunity Act of 1972, *reprinted in* Legislative History of the Equal Employment Opportunity Act of 1972, at 1844, 1845, *cited in Rayburn*, 772 F.2d at 1167 (emphasis added).

belief, religious doctrine, or church regulation.[26]  Preventing a church from hiring ministers in accordance with its own beliefs would inhibit its ability to put its doctrines into practice and would therefore violate the Free Exercise Clause.  Furthermore, such litigation would entangle courts in religious matters, in violation of the Establishment Clause.

This case, however, is about something completely different.  Petruska alleges that she was demoted because of animus against women that had nothing to do with religious beliefs, religious doctrine, or internal regulation.

While several of our sister circuits have opined that the employer's reasons are irrelevant to the ministerial exception, *see supra* pp. 10-11, we conclude that these reasons make all the difference.  The Constitution protects religious exercise,[27] and

---

[26]By "church regulation," we mean the internal rules under which a religious institution operates.

[27]*See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 564 (1997) (O'Connor, J., dissenting) ("[T]he Free Exercise Clause is properly understood as an affirmative guarantee of the right to participate in *religious activities* without impermissible governmental interference.") (emphasis added).

32

we decline to turn the Free Exercise Clause into a license for the free exercise of discrimination unmoored from religious principle.[28] We therefore conclude that under the Free Exercise Clause the ministerial exception will not bar Title VII claims by ministerial employees when an employment decision is not motivated by religious belief, religious doctrine, or church regulation. This version of the ministerial exception also comports with the Establishment Clause because courts will not be forced to consider religious questions, a process that would entangle the government in religious affairs.

### 1.

The Supreme Court has not addressed the ministerial exception, but our sister circuits have purported to derive it from

---

[28]According to a leading scholar of the religion clauses, "[t]o grant First Amendment immunity to . . . religious organizations in circumstances where its actions were not dictated by religious belief . . . is to invite misbehavior. Moreover, it seems unfair to deprive the poorly treated and now-estranged employee of any opportunity to bring the religious entity to account. . . ." Marci A. Hamilton, *God vs. the Gavel*: *Religion and the Rule of Law* 196 (2005).

Supreme Court cases that discuss the importance of church autonomy. However, the church autonomy cases protect a particular type of liberty: the right of a church to construe its own laws, regulations, and beliefs free of judicial interference. Because Title VII is a secular federal law as opposed to an internal ecclesiastical law, and because Gannon has offered no religious rationale for Petruska's demotion, the church autonomy cases do not apply.

*Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), stands for the proposition that a plaintiff cannot sue a church for departing from or misapplying its own laws and regulations. In *Milivojevich*, the Supreme Court of Illinois set aside a Bishop's removal and defrockment and the reorganization of a Diocese. *Id.* at 708. Critically, the basis for the state court's decision was that the church violated its own internal regulations, including its constitution and penal code. *Id.* at 708, 712-13. The Supreme Court held that the First Amendment barred the state court's inquiries into whether

34

church proceedings were "procedurally and substantively defective *under the internal regulations of the Mother Church.*" *Id.* at 698 (emphasis added).

Similarly, in *Gonzalez v. Roman Catholic Archbishop of Manilla*, 280 U.S. 1 (1929), the Court declined to overrule a church's interpretation of ecclesiastical law. An archbishop refused to appoint the plaintiff to a hereditary chaplaincy created by a trust, and the plaintiff sought a judgment declaring him the legal heir. *Id.* at 10-12. The archbishop's decision was based on provisions of the *Codex Juris Canonici*, which stated that to be eligible for a chaplaincy, one must have begun the study of theology. *Id.* at 13-14. The Court refused to overrule the archbishop's construction of ecclesiastical law. *Id*. at 16.[29]

*Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872), applies the same principle. The *Watson* Court "was asked to decree the

---

[29]Additionally, *Gonzalez* has nothing to do with the First Amendment: It was decided based on the terms of the trust, and without reference to the Constitution. *See Milivojevich,* 426 U.S. at 729-30 (Rehnquist, J., dissenting).

termination of an implied trust because of departures from doctrine." *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445 (1969). As the *Watson* Court stated, "whenever *the questions of discipline, or of faith, or ecclesiastical rule, custom, or law* have been decided" by church tribunals, "the legal tribunals must accept such decisions as final, and as binding on them." 80 U.S. at 727.[30]

Thus, the Supreme Court's church autonomy cases protect a religious institution's freedom to interpret its own laws and internal regulations. However, entirely separate questions

---

[30]*Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952), is also inapposite. *Kedroff* involved a dispute between the Moscow-based Russian Orthodox Church and its North American branch over the right to use and occupy a cathedral. *Id.* at 95-97. A New York law aimed to strengthen the North American branch at the expense of the Moscow-based church. *See Kedroff*, 344 U.S. at 109. The Supreme Court invalidated the New York statute largely because it was designed "for the benefit of one segment of a church" at the expense of another. *Id.* at 119. Thus, *Kedroff* stands for the familiar proposition that the state may not favor one religious group over another, a principle that has no relevance to this case.

are raised by the application of federal laws, such as Title VII, to a church.[31]  In contrast to an internal church law, Title VII, like any federal law, falls squarely within the ken of the federal judiciary.

In fact, in a separate line of cases addressing church property disputes, the Supreme Court has repeatedly stated that churches must adhere to laws, like Title VII, that are neutral and of general applicability.[32]  The Court has even stated that this principle extends to employment laws:  "The neutral-principles approach cannot be said to 'inhibit' the free exercise of religion,

---

[31]As *Milivojevich* recognizes, secular courts lack the expertise and authority necessary to interpret church law.  Indeed, if a secular court reviewed a church's decision on a matter of church law, the appeal would be "from the more learned tribunal in the law . . . to one which is less so."  426 U.S. at 715 n.8 (quoting *Watson*, 80 U.S. (13 Wall.) at 729).

[32]The Supreme Court applies a similar principle to neutral laws of general applicability that incidentally burden the activities of an individual, as opposed to a church.  *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-79 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition.").

37

any more than do other neutral provisions of state law governing the manner in which churches own property, *hire employees*, or purchase goods." *Jones*, 443 U.S. at 606 (emphasis added).

In *Presbyterian Church*, 393 U.S. at 443-44, a Georgia court instructed a jury to resolve a church property dispute between a general church and a local church based on matters of religious doctrine. *Id.* The Supreme Court held that the Georgia court violated the First Amendment, which "commands civil courts to decide church property disputes *without resolving underlying controversies over religious doctrine*." *Id.* at 449 (emphasis added). *Presbyterian Church*, however, leaves no doubt that religious organizations are bound by neutral laws of general applicability that do not require inquiry into religious doctrine. As the Court stated, "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Id.*

The following year, the Supreme Court reaffirmed

*Presbyterian Church*, holding in *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg*, 396 U.S. 367, 367-68 (1970), that a Maryland court properly considered legal documents to resolve a church property dispute. The Court opined that "the Maryland court's resolution of the dispute *involved no inquiry into religious doctrine*." *Id.* at 368 (emphasis added).

In *Jones*, the Court yet again stated that religious organizations are bound by secular laws, so long as those laws do not require inquiry into religious doctrine: "[A] State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." 443 U.S. at 602 (quotation omitted).[33] Indeed, courts applying neutral laws of general applicability to religious

---

[33]Jones further states: "We cannot agree . . . that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, *even where no issue of doctrinal controversy is involved*." *Id.* at 605 (emphasis added).

39

institutions remain "free . . . completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* at 603.

Because Petruska brings suit under Title VII, the rule of *Presbyterian Church*, *Maryland and Virginia Churches*, and *Jones* will bar her suit only if an inquiry into matters of religious doctrine is required. Here, nothing in the complaint suggests that Petruska's demotion was based on religious belief, religious doctrine, or internal church regulation. At this stage, and as we explain more fully in the following sections, the case requires no inquiry into religious doctrine.

**2.**

We now turn to the rationales that other courts have used to justify the ministerial exception, inquiring whether these rationales support an exception that applies without regard to the motivation for an employment decision. As discussed above, *see supra* pp. 12-15, courts have offered three explanations of why the Constitution might require the ministerial exception. We address these arguments in turn.

40

**First Rationale:  Government Scrutiny**

Some of our sister circuits have opined that the ministerial exception is necessary to avoid government scrutiny of religious affairs.  *See supra* p. 13. This argument derives largely from *Catholic Bishop*, where the Supreme Court held that the NLRB lacked jurisdiction to order collective bargaining between teachers and church-operated schools.  The Supreme Court's holding was based largely on the concern that NLRB supervision would entangle the government with religious schools, in violation of the Establishment Clause.  *See Catholic Bishop*, 440 U.S. at 501-04.

In *Geary*, however, we distinguished *Catholic Bishop* and held that a non-minister could bring a Title VII suit against a religious employer.  We explained that employment discrimination laws, at least as applied to a non-minister, require far less scrutiny of religious affairs than NLRB supervision of religious schools.  In an employment discrimination case, "[t]he secular tribunal merely asks whether a sincerely held religious

41

belief actually motivated the institution's actions. The institution, at most, is called upon to explain the application of its own doctrines." *Geary*, 7 F.3d at 330.[34]

Following *Catholic Bishop* and *Geary*, we must decide whether allowing Petruska's suit to proceed would lead to excessive judicial scrutiny of Gannon. In considering this question, we take into account the principle articulated by the Supreme Court in the church autonomy and church property cases: A secular court must not resolve issues of religious belief, religious doctrine, or internal church regulation. Applying this principle, we ask not whether courts will be required to consider the affairs of a church in general, but whether courts will be forced to decide matters that Supreme Court precedent places beyond judicial scrutiny.

---

[34]*See also DeMarco v. Holy Cross High School*, 4 F.3d 166, 169-70 (2d Cir. 1993) ("While the NLRB is 'continuously involved in the enforcement of collective bargaining agreements and resolution of labor disputes,' ADEA actions do not require extensive or continuous administrative or judicial intrusion into the functions of religious institutions.") (citations omitted).

At this stage of the litigation, we cannot say that the case will require examination of religious belief, religious doctrine, or internal church regulation. Indeed, it is entirely possible that Gannon will continue not to offer a religious justification for Petruska's demotion. In such event, the decisive question for the District Court or the jury will be whether Petruska was demoted due to her gender, and this question will remain independent of religious matters.

Alternatively, Gannon may offer an explanation for Petruska's demotion that is grounded in religious principles or internal church regulations. The mere assertion of either type of explanation would not necessarily require the dismissal of Petruska's claims.

We imagine that the justification could take two forms. First, Gannon might argue that Petruska was demoted for reasons independent of gender discrimination. For example, Gannon might assert that Petruska was demoted for failing to

43

attend mass, in contravention of Catholic doctrine.[35] Alternatively, Gannon might concede that it discriminated against Petruska on the basis of gender but assert that the discrimination was grounded in religious doctrines or internal regulations. For example, and again speaking in the hypothetical, Gannon might contend that Catholic doctrine does not allow female university chaplains.

In the first type of case, the task of the District Court or the jury would be to determine whether the challenged employment action was motivated by the proffered religious doctrine or by sex discrimination. As in *Geary*, the employee could not "challenge the validity, existence or 'plausibility'" of the religious doctrine itself. *See Geary*, 7 F.3d at 330. However, the employee could contend that the asserted religious rationale "did not in fact motivate" the adverse employment action. *Id.*

---

[35]This example is purely illustrative, and is not based on the record.

44

For example, if Gannon contended that Petruska did not attend mass, she would be precluded from asserting that Catholic doctrine did not require her to do so.  She could, however, argue that she was not actually demoted for failing to attend mass.  By way of illustration, she could substantiate her allegations that Ostrowski told her that she was being demoted solely on the basis of her gender and that Trautman sought to "clean house" by removing women from leadership positions. Petruska might also cite evidence that in the past male chaplains who refused to attend mass did not suffer adverse employment action.  To determine whether this evidence demonstrated gender discrimination, a factfinder would not have to delve into religious questions.  As we stated in *Geary*, "[a] conclusion that the religious reason did not in fact motivate dismissal would not implicate entanglement since that conclusion implies nothing about the validity of the religious doctrine or practice." *Id.*

Gannon might instead concede that it demoted Petruska on the basis of gender but contend that the discrimination was

motivated by religious doctrine or internal regulation. The factfinder's task would then be to determine whether the discrimination was indeed motivated by religious principles or church regulations; if so, the ministerial exception would bar the claim. Petruska could not challenge the validity of the asserted doctrine. Thus, if Gannon asserted that Catholicism forbids female university chaplains, Petruska could not contend otherwise. Furthermore, Petruska could not prevail merely by pointing to evidence of sex discrimination, since such discrimination, if religiously motivated, would be beyond judicial scrutiny. Still, it is conceivable that Petruska could cite evidence that she was demoted due to discrimination without any religious basis. For example, she might present evidence that the decisionmakers *said* that they had no religious reason to discriminate against her. In assessing evidence of this nature, the factfinder would not have to decide religious questions.

If Gannon offers either type of religious rationale, the District Court may be constitutionally required to limit

46

discovery or exclude evidence designed to call into question the validity, existence, or plausibility of the religious doctrine. For example, if Gannon argued that Petruska was demoted for failure to attend mass, Petruska obviously would not be allowed to question the doctrine by citing church law or the Bible. In this regard, we find the D.C. Circuit's discussion of a minister's contract claim instructive:

> It could turn out that in attempting to prove his case, appellant will be forced to inquire into matters of ecclesiastical policy . . . . Of course, in that situation, a court may grant summary judgment on the ground that appellant has not proved his case and pursuing the matter further would create an excessive entanglement with religion. On the other hand, it may turn out that the potentially mischievous aspects of [appellant's] claim are not contested by the Church or are subject to entirely neutral methods of proof. The speculative nature of our discussion here demonstrates why it is premature to foreclose appellant's . . . claim. Once evidence is offered, the district court will be in a position to control the case so as to protect against any impermissible entanglements.

*Minker v. Baltimore Annual Conf. of United Methodist Church*,

47

894 F.2d 1354, 1360 (D.C. Cir. 1990).[36]

We recognize that this process will often require a nuanced analysis of whether a piece of evidence calls religious doctrines into question, but we are confident that the excellent district courts in this Circuit are up to the task.[37] Moreover, the possibility that courts in this case will have to make fine distinctions in the future is not a sufficient reason to foreclose Petruska's suit now. After all, when we restrict the reach of a statute so as to preserve the Constitution, we must cut with a scalpel, not a butcher's knife.[38] Therefore, Petruska's claims

[36]*See also Bollard*, 196 F.3d at 950 ("The limited nature of the inquiry, combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.").

[37]*See DeMarco*, 4 F.3d at 172 ( "[W]e are confident that the able district judge will be able to focus the trial upon whether DeMarco was fired because of his age or because of failure to perform religious duties, and that this can be done without putting into issue the validity or truthfulness of Catholic religious teaching.").

[38]As the Supreme Court has recently reminded us, "we must 'refrain from invalidating more of [a] statute than is necessary.'" *See United States v. Booker*, 543 U.S. 220, 258 (2005) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)).

may—or may not—present constitutional problems later on, and we will not bar them now based on mere speculation.

Although Gannon "would be *likely* to defend its employment action on grounds related to church needs rooted in church doctrine," *see Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006) (emphasis added), and although this defense might require limiting discovery or excluding certain evidence, we do not think that this possibility requires us to prophylactically disregard the command of Congress. Such an approach would risk foreclosing perfectly valid claims, thereby ignoring the will of Congress without a justification rooted in the Constitution. We will not, until we have a constitutional reason to do so, enfeeble "a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had been excluded from the American dream for so long." *United Steelworkers of America v. Weber*, 443 U.S. 193, 204 (1979) (quotation omitted).

**Second Rationale: Selection of Clergy**

Aside from the "government scrutiny" rationale, which seeks to shield churches from government inquiry, examination, or probing, some courts have opined that the law should have no authority over a church's decision to fire a ministerial employee. *See supra* pp. 13-14. We agree with this argument, but only to a point. True, if a religious employer fired a ministerial employee for reasons related to faith, doctrine, or internal regulation, a judgment against the church would punish the church for expressing its beliefs. But where an employment decision is devoid of religious or doctrinal content, and is based solely on sexism, we fail to see how the decision relates to the free exercise of religion.

Let us assume that a male applicant and a female applicant for a ministerial position have identical religious views, that they are equally qualified, and that there is no religious reason to chose one over the other. Let us further assume that the decisionmaker chooses the male candidate due to sexism that is utterly unconnected to his religious beliefs. In

50

such a case, we do not think that allowing the female candidate to bring suit under Title VII would infringe the religious autonomy of the church.

Critically, a host of statutory and constitutional protections continue to guarantee a church's freedom to select ministers for religious reasons. First, religious institutions retain the right to fire ministers for conduct inconsistent with religious precepts or for membership in the wrong religion. *See Little*, 929 F.2d at 951. Second, as we have mentioned, religious institutions may even practice race and sex discrimination that is otherwise illegal, so long as the discrimination is grounded in religious doctrine or internal regulation. Third, a plaintiff cannot challenge the validity or existence of religious doctrines in the course of litigation.[39] Under the rule we now adopt,

---

[39]We also note that because Petruska seeks only monetary damages, her suit does not threaten to alter the composition of Gannon's ministerial staff. *See Bollard*, 196 F.3d at 950 (holding that the ministerial exception did not bar a sexual harassment suit against a religious institution, where the plaintiff sought only damages); *Minker*, 894 F.2d at 1360 ("[A]s the remedy would be limited to the award of money damages, we see no potential for

religious institutions lose only the power to fire ministerial employees for secular reasons, a power unrelated to the exercise of religion.

**Third Rationale:  Inquiry into Religious Doctrine**

Finally, other Courts of Appeals have opined that the ministerial exception prevents judicial inquiry into matters of religious doctrine.  *See supra* pp. 14-15.  In light of our discussion thus far, little remains to be said.  At this point in the litigation, we cannot conclude that Petruska's claims will raise questions of a religious nature, requiring secular courts to "tak[e] on the additional role of religious courts, as if the United States were a theocracy."  *Tomic*, 442 F.3d at 1042.

In sum, neither Supreme Court precedent nor the arguments advanced by our sister circuits supports a ministerial exception that applies without regard to the reason for an employment decision.  We therefore reverse the dismissal of Petruska's Title VII sex discrimination claim.

---

distortion of church appointment decisions. . . .").

52

**IV.**

Independent of her sex discrimination claim, Petruska

also alleges that she was demoted in retaliation for opposing

sexual harassment at Gannon.[40] We apply the same analysis to

the  retaliation claim as to the sex discrimination claim,

inquiring whether the complaint alleges that the retaliation was

based on religious belief, religious doctrine, or internal church

regulation.  There is no indication that a doctrine or regulation

prohibits opposing sexual harassment or questioning sexual

harassment policies.  Therefore, at this stage, and for the reasons

stated above, the claim does not collide with Gannon's free

exercise rights or entangle secular courts in religious questions.

Accordingly, we reverse the District Court's dismissal of

---

[40]To repeat, Petruska alleges that she opposed limiting the time frame during which a Gannon employee could file a sexual harassment grievance with the university; helped prepare a report criticizing the university's sexual harassment policies; played a pivotal role in notifying Ostrowski and Trautman that Rubino had sexually harassed a Gannon employee for several years; and opposed Trautman's decision to allow a former Gannon priest, who had been terminated for sexual misconduct toward students, to enter the university's campus.

Petruska's Title VII retaliation claim.

## V.

Aside from her Title VII claims, Petruska's complaint also contains four state law claims: breach of contract, civil conspiracy, negligent supervision and retention, and fraudulent misrepresentation. While the ministerial exception as such applies only to Title VII, courts have applied similar doctrines to restrict state law claims arising out of the employment relationship between a religious organization and a ministerial employee.

Like every court to decide the issue, we conclude that the First Amendment bars state law claims that require an interpretation of religious belief, religious doctrine, or internal church regulation.[41] On the other hand, courts have held that the

---

[41]To allow a secular court to inquire into such matters would contravene *Milivojevich*, which forbids examination of "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." 426 U.S. at 713. Applying *Milivojevich*, the First Circuit dismissed a plaintiff's claim that he was discharged in violation of procedures "articulated in [a church's] General Constitution, certain Auxiliary Constitutions, and a variety of

religion clauses permit state law employment claims that do not require inquiry into such matters. In *Minker*, a Methodist minister asserted two contract claims against the United Methodist Church: (1) breach of promises to find him a more suitable congregation and (2) violation of the Book of Discipline, a statement of church law. 894 F.2d at 1355-56. The Court held that the religion clauses barred the Book of Discipline claim, which would require interpreting "matters of essential religious dogma." *Id.* at 1358. However, the Court permitted the oral promise claim, which did not require inquiry into such matters. The Court reasoned that "[a] church is always free to burden its activities voluntarily through contracts, and

---

bylaws, rules, and regulations." *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1576 (1st Cir. 1989). Similarly, in *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940, 943 (6th Cir. 1992), the Sixth Circuit dismissed state law claims where the employee asserted that his dismissal was based "on a misapplication of [church] procedures and laws." *See also Hutchison v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986) (dismissing contract claim based on *The Discipline*, a collection of Methodist "rules, laws, and doctrinal statements").

such contracts are fully enforceable in civil court." *Id.* at 1359.[42]

Applying the reasoning of *Minker*, we ask whether, at this stage of litigation, each of Petruska's state law claims requires an examination of matters of faith, doctrine, or internal regulation.

## A. Breach of Contract

Petruska alleges that Gannon, by demoting her, breached her contract to serve as chaplain for three years. At this stage, we cannot assume that interpreting Petruska's contract will give rise to questions of religious belief, religious doctrine, or internal church regulation.[43] *See Drevlow v. Lutheran Church*,

---

[42]Similarly, the Eighth Circuit reversed the dismissal of a minister's state law employment claims, reasoning, "[a]t the present stage of this litigation we are unable to predict that the evidence offered at trial will definitely involve the district court in an impermissible inquiry into . . . bylaws or religious beliefs." *Drevlow v. Lutheran Church*, 991 F.2d 468, 471 (8th Cir. 1993); *see also Rayburn*, 772 F.2d at 1171 ("Like any other person or organization, [churches] may be held liable for their torts and upon their valid contracts.").

[43]In alleging that she was removed as chaplain, Petruska alludes to Gannon's Policies and Procedures Manual, which lists

991 F.2d 468, 471 (8th Cir. 1993). Accordingly, we reverse the

dismissal of Petruska's breach of contract claim.

## B. Fraudulent Misrepresentation

Petruska's fraudulent misrepresentation claim is based on

(1) Gannon's representations that it is an equal opportunity

employer and (2) Rubino's assurance at the time of Petruska's

promotion to chaplain that her tenure would reflect her

performance as opposed to her gender. At least at the outset,

Petruska's fraudulent misrepresentation claim "do[es] not

inevitably or even necessarily lead to government inquiry into

[Gannon's] religious mission or doctrines." *Geary*, 7 F.3d at

329.

While the religion clauses do not bar Petruska's

fraudulent misrepresentation claim, she has failed to plead fraud

---

the duties of the chaplain. Presumably, the manual is a statement of Gannon's internal regulations. On remand, the religion clauses may bar Petruska from citing the manual as evidence of her breach of contract claim, for in order to evaluate such evidence, the factfinder might have to consider questions of internal church regulation.

57

with sufficient particularity under Federal Rule of Civil Procedure 9(b).[44] We therefore affirm the District Court's dismissal of this claim.

### C. Negligent Supervision and Retention and Civil Conspiracy

Petruska's negligent supervision and retention claim and her civil conspiracy claim flow directly from her Title VII allegations. Civil conspiracy requires proof that two or more persons combined to do an unlawful act or to do an otherwise lawful act by unlawful means. *See, e.g.*, *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211 (Pa. 1979). Here, the underlying unlawful acts are the very violations of Title VII discussed in the previous sections.

Likewise, Petruska's negligent supervision and retention claim flows from her Title VII allegations: She claims that

---

[44]*See Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983) (stating that the requirements of Rule 9(b) "appl[y] not only to fraud actions under federal statutes, but to fraud claims based on state law.").

58

Gannon negligently supervised and retained the employees who discriminated against her.  Gannon has not asserted a reason for the retention of these employees that is grounded in faith, doctrine, or internal regulation.

As a corollary to our conclusion that Petruska must be allowed to proceed with her Title VII claims, we hold that at this stage the First Amendment does not foreclose her conspiracy and negligent supervision and retention claims. We therefore reverse the District Court's dismissal of these claims.

## VI.

At this stage of litigation, Petruska's claim offends neither the Free Exercise Clause nor the Establishment Clause. We therefore hold that the religion clauses do not bar Petruska's causes of action, and we reverse the dismissal of all claims, with the exception of the fraudulent misrepresentation claim.  We stress that constitutional defects in Petruska's causes of action may emerge as the case proceeds, and that the District Court must avoid them scrupulously, applying the guidance we have

59

provided.[45]  Ultimately, the constitutional concerns that lurk at

the periphery of this case may defeat Petruska's claims.  But that

is a question for another day.

---

[45]We reject Petruska's argument that Gannon waived the ministerial exception as a defense.  *See Tomic*, 442 F.3d at 1042 ("[T]he ministerial exception . . . is not subject to waiver or estoppel . . . . A federal court will not allow itself to get dragged into a religious controversy even if a religious organization wants it dragged in.").  Because Gannon did not waive the ministerial exception, Gannon may assert the exception, as defined by this opinion, in further proceedings.

SMITH, J., *concurring in part and dissenting in part.*

Although the majority professes to adopt a "carefully tailored version of the ministerial exception" to Title VII, Maj. Op. at 3, in fact, by treating ministers like lay employees, it effectively refuses to recognize any ministerial exception, placing this Court at odds with every other federal court of appeals to consider the issue. The majority holds that "where a church discriminates for reasons unrelated to religion, . . . the Constitution does not foreclose Title VII suits." Maj. Op. at 4. It concludes that because Gannon has not–or at least not yet–articulated a "religious belief, religious doctrine, or internal regulation" as a basis for its decision to restructure, adjudication of Petruska's claims does not offend the First Amendment. *Id.* I disagree with the majority's fundamental premise that a church's choice regarding who performs particular spiritual functions is not necessarily a religious decision. Rather, in my view, such a decision is, by its very nature, a religious one. Consequently, government interference with that decision necessarily infringes on a church's free exercise of religion and entangles the courts in religious matters. I would therefore apply the ministerial exception to any claim which limits a church's right to choose who will perform particular spiritual functions, without regard to whether it articulates an independent justification based on "religious belief, religious doctrine, or internal regulation."

I agree with the majority's conclusion that Gannon's motion to dismiss is properly considered under Federal Rule of Civil Procedure 12(b)(6) and that Petruska failed to allege fraudulent misrepresentation with sufficient specificity under Federal Rule of Civil Procedure 9(b). Accordingly, I concur in the introduction of Part III and in Part V.B. of the Opinion. I

also agree that adjudication of Petruska's breach of contract claim would not violate the First Amendment, and therefore likewise concur in Part V.A. However, because Petruska's own complaint establishes that her primary duties included spiritual functions and because her Title VII, civil conspiracy, and negligent supervision and retention claims implicate the church's right to select its spiritual leaders, I would hold that these claims are barred by the ministerial exception. I therefore respectfully dissent.

I.

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. The Religion Clauses extend to both legislative and judicial action, *see Kreshik v. Saint Nicholas Cathedral of Russian Orthodox Church of North Amer.*, 363 U.S. 190, 191 (1960), and apply equally to state and federal laws, *see Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 (2004) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). The Free Exercise Clause protects both the "right to believe and profess whatever religious doctrine one desires," *Employment Division, Dep't of Human Resources v. Smith*, 494 U.S. 872, 877 (1990), and the right of religious institutions to decide "matters of church government" as well as questions of "discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *See Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976). The Establishment Clause, by contrast, prohibits government action that serves to advance or inhibit religion or that results in excessive entanglement "in questions of religious doctrine, polity, and practice." *See Jones*

*v. Wolf*, 443 U.S. 595, 603 (1979); *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

The questions presented in this case are whether applying Title VII to Gannon's decision to restructure would infringe upon its free exercise rights and whether adjudication of Petruska's Title VII claims would result in unconstitutional entanglement under the Establishment Clause. Every circuit that has considered the issue has concluded that application of Title VII to a minister-church relationship would violate–or would risk violating–the First Amendment and, accordingly, has recognized some version of the ministerial exception.[46] To the

---

[46] *See, e.g., EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000); *Rayburn v. Gen'l Conf. of Seventh Day Adventists*, 772 F.2d 1164 (4th Cir. 1985); *Combs v. Central Texas Annual Conf. of the United Methodist Church,* 173 F.3d 343 (5th Cir. 1999); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003); *Young v. Northern Illinois Conf. of United Methodist Church*, 21 F.3d 184 (7th Cir. 1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360 (8th Cir. 1991); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004); *Bollard v. Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999); *Gellington v. Chistian Methodist Episcopal Church*, 203 F.3d 1299 (11th Cir. 2000); *EEOC v. Catholic Univ. of Amer.*, 83 F.3d 455 (D.C. Cir. 1996); *see also Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999) (applying ministerial exception to Americans with Disabilities Act claim); *Werft v. Desert Southwest Annual Conf. of the United Methodist Church*, 377 F.3d 1099 (9th Cir. 2004) (same).

The First Circuit also addressed the application of the First Amendment to a minister's claims in *Natal v. Christian Missionary*

extent that a claim involves the church's selection of clergy–in other words, its choice as to who will perform particular spiritual functions[47]–most of these circuits have held that the

---

*Alliance*, 878 F.2d 1575 (1st Cir. 1989)  Although the case involved state law claims rather than any federal employment discrimination law, the Court made clear that inquiry into allegations related to a minister's employment would be barred by the First Amendment.  Specifically, it explained:

> Because of the difficulties inherent in separating the message from the messenger–a religious organization's fate is inextricably bound up with those whom it entrusts with the responsibilities of preaching its word and ministering to its adherents–Natal's case necessarily falls within the scope of the Court's monition.  By its nature, the inquiry which Natal would have us undertake into the circumstances of his discharge plunges an inquisitor into a maelstrom of Church policy, administration, and governance.  It is an inquiry barred by the Free Exercise Clause.

*Id.* at 1578.

[47] In evaluating whether a particular employee is subject to the ministerial exception, other circuits have concluded that the focus should be on the "function of the position." *Rayburn*, 772 F.2d at 1168.  As a general rule, an employee will be considered a minister if her primary duties include "teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship." *Id. at* 1169; *see, e.g., Alicea-Hernandez*, 320 F.3d at 703 (applying ministerial exception to Hispanic Communications Director who functioned as a "press secretary" for the church); *Starkman*, 198

exception bars any inquiry into a religious organization's underlying motivation for the contested employment decision.[48]

---

F.3d at 175-76 (holding that Choir Director at Methodist church was minister for purposes of First Amendment analysis); *Catholic Univ.*, 83 F.3d at 455 (applying exception to professor of canon law at Catholic University).  Although I do not view this list as exclusive, I agree that the focus on the function of an employee's position is the proper one.

[48]  *See Rayburn*, 772 F.2d at 1169 ("[T]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it.  In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content"); *Combs*, 173 F.3d at 350 ("We cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread."); *Young*, 21 F.3d at 186 (quoting *Rayburn*, 772 F.2d at 1169 ); *Scharon*, 929 F.2d at 363 ("Personnel decisions by church-affiliated institutions affecting clergy are *per se* religious matters and cannot be reviewed by civil courts for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made.  This is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids.") (citations omitted); *Bollard*, 196 F.3d at 947 (indicating that a "Jesuit order's choice of representative" is ordinarily "a decision to which we would simply defer without further inquiry"); *Minker*, 894 F.2d at 1357 (finding that court need not determine whether reasons for employment decision were "independently ecclesiastical in nature" to apply ministerial exception).

I would likewise hold.

A.

The majority opines that adjudication of Petruska's claims would not violate the Free Exercise Clause–unless and until Gannon articulates a "religious belief, religious doctrine, or internal regulation" as a justification for its decision to restructure–because the Constitution protects only "religious exercise." Maj. Op. at 28 (citing *City of Boerne v. Flores,* 521 U.S. 507, 564 (1997) (O'Connor, J, dissenting)). I agree with the majority's basic premise that a church must be engaged in religious exercise in order to trigger protection under the Free Exercise Clause. In my view, however, the process of selecting a minister is *per se* a religious exercise. A minister is not merely an employee of the church; she is the embodiment of its message. A minister serves as the church's public representative, its ambassador, and its voice to the faithful. As the Fifth Circuit explained: "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its

As the majority notes in footnote 6, "[a]lthough the Eleventh Circuit has recognized the ministerial exception, *see Gellington*, 203 F.3d 1299, it does not appear to address whether the exception applies without regard to motive." Maj. Op. at 13, n.6. Although I generally agree with the majority's characterization of *Gellington*, I note that the Eleventh Circuit seems to tacitly approve of a conclusion by the Fifth Circuit that "the constitutional protection of religious freedom afforded to churches in employment actions involving clergy exists even when such actions are not based on issues of church doctrine or ecclesiastical law." *Gellington*, 203 F.3d at 1303 (citing *Combs,* 173 F.3d at 350).

purpose." *McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir. 1972). Accordingly, "[m]atters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id.* at 559.[49]

As previously noted, the Free Exercise Clause protects two rights: the right to believe and profess matters of faith and the right of religious institutions to decide questions of governance and internal organization. In this case, those rights are interrelated.

First, like an individual, a church in its collective capacity must be free to express religious beliefs, profess matters of faith, and communicate its religious message. However, unlike an individual who can speak on her own behalf, the church as an institution must retain the corollary right to select its voice. Accordingly, any restriction of the church's right to choose who will carry its spiritual message necessarily infringes upon its Free Exercise right to profess its beliefs. This right is squarely at issue in Petruska's complaint.

The second right protected by the Free Exercise Clause–the church's right to decide matters of governance and internal organization–is also implicated by Gannon's decision to restructure. The majority contends that this right only protects "a religious institution's freedom to interpret its own

---

[49] In addition to their role within the religious organization, ministers also have a direct relationship with a church's members: Ministers marry their children and bury their parents; they act as their spiritual counselors and serve as their moral advisors. To these members, the selection of a minister is undoubtedly a question of religious concern.

67

laws and internal regulations." Maj. Op. at 31. Because Gannon has not identified an internal regulation or religious doctrine that required it to create the position of Vice President for Mission and Ministry and to hire Father Rouch to fill that position, the majority contends that the free exercise right to determine matters of governance and internal organization is not at issue. Maj. Op. at 29-31 (distinguishing *Serbian Eastern Orthodox v. Milivojevich*, 426 U.S. 696 (1976), *Gonzalez v. Roman Archbishop of Manila*, 280 U.S. 1 (1929), and *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872)). I disagree.

The Vice President for Mission and Ministry and the University Chaplain at Gannon both serve spiritual functions–in other words, the primary duties of those employees include "teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship."[50] *See Rayburn*, 772 F.2d at 1169.

---

[50] Petruska argues that she was not a "chaplain" as that term is understood in the Roman Catholic Church, nor did she have any written job requirements which specifically defined her position at the University. Nevertheless, Petruska's own complaint establishes that her primary duties involved ministerial functions. Among other things, Petruska alleges that she served as co-chair for the Catholic Identity Task Force, held prayer services, and was traditionally involved in planning liturgies. Moreover, as the District Court correctly noted, her own "performance objectives" included "develop[ing] strategies to increase participation in sacramental life of [the] Gannon community." It is clear from the face of Petruska's complaint that the functions she performed as University Chaplain were ministerial in nature.

With respect to the Vice President of Mission and Ministry position, Petruska alleges that Rouch was installed in that role and

Accordingly, Gannon's decisions regarding who to install in those positions and the manner in which their duties would be divided were decisions about who would perform those constitutionally protected spiritual functions. Those choices are protected from governmental interference by the Free Exercise Clause.

The majority further opines that there is "no doubt that religious organizations are bound by neutral laws of general applicability that do not require inquiry into religious doctrine." Maj. Op. at 32-34 (citing *Jones v. Wolf*, 443 U.S. 595, 606 (1979); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian* Church, 393 U.S. 440, 445 (1969); *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg*, 396 US. 367, 367-68 (1970); *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)). The majority cites *Jones* for the proposition that "'[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, *hire employees*, or purchase goods.'" Maj. Op. at 32 (citing *Jones*, 443 U.S. at 606)(emphasis in the majority opinion).

Title VII is indeed a neutral law of general applicability, and it undoubtedly applies to *lay* employment decisions by religious institutions. 42 U.S.C. § 2000e-2; 42 U.S.C. § 2000e-3;

served in a supervisory capacity over the Chaplain's Division. To the extent that the Vice President of Mission and Ministry supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual functions.

69

*but see* 42 U.S.C. § 2000e-1(a) (providing an exception for "religious corporation, association, educational institution, or society with respect to employment of individuals of a particular religion to perform work connected with the carrying on . . . of its activities); 42 U.S.C. § 2000e-2(e) (permitting religious educational institutions "to hire and employ employees of a particular religion").  However, because I view a church's selection of its *minister* as essential to the church's right to express religious beliefs, profess matters of faith, and communicate its religious message, I differ with the majority's conclusion that application of Title VII in this case does not violate the Free Exercise Clause. *See Catholic Univ*., 83 F.3d at 463 ("We conclude from our review of the Supreme Court's jurisprudence that whereas the Free Exercise Clause guarantees a church's freedom to decide how it will govern itself, what it will teach, and to whom it will entrust its ministerial responsibilities, it does *not* guarantee the right of its members to practice what their church may preach if that practice is forbidden by a neutral law of general application.").  In reaching its conclusion that the language in *Jones* applies equally to lay employees and ministers, the majority has effectively refused to adopt the ministerial exception recognized in our sister courts of appeals.  Because I agree with those courts that interference with a church's selection of clergy violates the First Amendment, I cannot join my colleagues in the majority.

B.

Although, in my view, the Free Exercise Clause bars any claim which limits a church's right to choose who will fulfill particular spiritual functions–in this case, Petruska's Title VII discrimination and retaliation, civil conspiracy, and negligent supervision and retention claims–I nevertheless

70

address the Establishment Clause in response to the majority's treatment of that issue. The majority holds that, unless and until Gannon articulates a "religious belief, religious doctrine, or internal regulation" as a justification for its decision to install Father Rouch as Vice President of Mission and Ministry, there is no risk of unconstitutional entanglement under the Establishment Clause. I do not agree.

In *Lemon v. Kurtzman*, the Supreme Court set forth a three-prong test to determine the validity of a statute under the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; . . . and finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. 602, 612-13 (1971) (citations omitted). Only the entanglement prong is at issue with respect to Title VII.

Excessive entanglement would arise if our inquiry into Gannon's decision to restructure traversed questions of the validity of religious beliefs or practice. *See Geary*, 7 F.3d at 330. Because, as discussed above, a church's choice regarding who will perform its spiritual functions is inherently a religious decision, any inquiry into that decision would traverse such questions. Even though the decision here involves an individual act rather than general practice, the necessary inquiry–asking whether the church can justify its employment decision with reference to church doctrine–excessively entangles the court.

The majority relies on *Geary* to support its conclusion that application of Title VII in this case would not run afoul of the Establishment Clause. The decision in *Geary*, however,

actually undermines the majority's position. The *Geary* Court, specifically distinguishes between decisions involving clergy and those involving lay employees.

In *Geary*, a fifty-year-old teacher was fired by the Catholic school that employed her. The school's stated reason for dismissal was that Geary had married a divorced man in violation of church doctrine. *Id.* We concluded that resolution of Geary's Age Discrimination in Employment Act claims would not offend the Establishment Clause because the inquiry was limited to whether the school discriminated against her on the basis of her age and canceled her insurance in retaliation for her initiation of legal proceedings. *Id.* Geary did not challenge the validity of the religious doctrine; she merely claimed that the religious doctrine did not motivate the adverse employment action. *Id.* at 329. We held that "when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious visions, that inquiry does not present a significant risk of entanglement." *Id.* at 330.

The *Geary* Court itself, however, distinguished cases involving members of the clergy, stating that "notwithstanding Geary's apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate Geary's claims *without the entanglement that would follow were employment of clergy or religious leaders involved.*" *Id.* at 331 (emphasis added). As we suggested in *Geary*, entanglement necessarily results when a court inquires into a decision regarding who performs spiritual functions on behalf of the church, because, unlike lay employees, that decision is

72

inherently a religious matter. Again, notwithstanding the majority's claim that it is crafting a narrow ministerial exception, its failure to acknowledge the distinction drawn in *Geary* between lay employees and ministers is tantamount to a refusal to adopt any such exception.

## II.

As described above, the ministerial exception should operate to bar any claims that limit a church's right to choose who will perform its spiritual functions. Accordingly, in this case, the relevant question with respect to each claim is whether application of the state or federal law will limit Gannon's right to choose who performs particular spiritual functions on its behalf. Petruska asserts six claims in her First Amended Complaint: two violations of Title VII–discrimination and retaliation (Counts I and II, respectively); fraudulent misrepresentation (Count III); civil conspiracy (Count IV); breach of contract (Count V); and negligent supervision and retention (Count VI). I submit that resolution of Counts I, II, IV, and VI would impose unconstitutional limits on Gannon's First Amendment rights. Consequently, I would hold that they are barred by the ministerial exception.

## A.

Petruska alleges that Gannon demoted and constructively discharged her from her position as University Chaplain based on her gender and retaliated against her on the basis of her opposition to sexual harassment at the University. Her discrimination and retaliation claims are premised upon Gannon's decision to restructure, a decision which Petruska argues was merely pretext for gender discrimination. It is clear

73

from the face of Petruska's complaint, however, that Gannon's choice to restructure constituted a decision about who would perform spiritual functions and about how those functions would be divided. Accordingly, application of Title VII's discrimination and retaliation provisions to Gannon's decision to restructure would violate the First Amendment.[51] For that reason, Petruska's Title VII claims (Counts I and II) should be dismissed.

---

[51] I acknowledge that it may not always be clear whether a minister's Title VII claim involves "a church's decision regarding who will perform spiritual functions. For example, in *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004), the Ninth Circuit considered a Presbyterian minister's claims that she was sexually harassed and subject to retaliation by her supervising pastor. The *Elvig* Court recognized that a church's decisions in selecting its clergy are protected by the First Amendment and held that to the extent that a plaintiff's claims implicated ministerial employment decisions, the claims were foreclosed. Nevertheless, over a vigorous dissent, the Court concluded that, in that case, the sexual harassment, hostile work environment, and retaliation claims (verbal abuse and intimidation) did not implicate protected employment decisions. It therefore reversed the district court's order dismissing those claims.

In Petruska's case, the retaliatory conduct at issue is the employment decision itself, which *Elvig* recognizes as a decision protected by the Free Exercise Clause. Because Petruska does not raise a sexual harassment or hostile work environment claim and because the retaliatory conduct she alleges constitutes a protected choice, we need not decide today whether the types of claims in *Elvig* would fall within the ministerial exception to Title VII.

74

B.

Petruska's First Amended Complaint also contains three state tort claims: civil conspiracy, negligent supervision and retention, and fraudulent misrepresentation.[52] The civil conspiracy[53] and negligent supervision[54] claims turn on Petruska's ability to prove that Gannon's restructuring constituted an unlawful or tortious act. In this case, the alleged underlying unlawful act is the violation of Title VII. Because I would hold that Gannon's decision to restructure fell within the ministerial exception to Title VII, these claims should also be

---

[52] I agree with the majority insofar as it concludes that Petruska has failed to plead fraud with sufficient specificity under Federal Rule of Civil Procedure 9(b), and accordingly, concur in its judgment to affirm the dismissal of Count III.

[53] Civil conspiracy requires proof that two or more persons combined to do an unlawful act or to do an otherwise lawful act by unlawful means. *See, e.g., Thompson Coal Co. v. Pike Coal*, 412 A.2d 466, 472 (Pa. 1979).

[54] Under Pennsylvania law, an employer may be liable for negligent supervision "where the employer fails to exercise ordinary care to prevent an intentional harm to a third party which (1) is committed on the employer's premises by an employee acting outside the scope of his employment and (2) is reasonably foreseeable." *Mullen v. Topper's Salon & Health Spa, Inc.,* 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000) (citations omitted). Although Petruska's First Amended Complaint is replete with references to the current priest sexual abuse scandals and allegations that Bishop Trautman covered up harassment and abuse directed towards other individuals, the only intentional harm to which she claims she was personally subjected is the underlying discrimination and retaliation.

75

dismissed.

## C.

Finally, Petruska asserts a state law breach of contract claim. Petruska alleges that pursuant to her contract with Gannon, she was entitled to serve on the President's Staff and lead the Chaplain's Division. She claims that by removing her from these positions, Gannon breached its promise.

On its face, application of state contract law does not involve government-imposed limits on Gannon's right to select its ministers: Unlike the duties under Title VII and state tort law, contractual obligations are entirely voluntary. As the court noted in *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360 (D.C. Cir. 1990), "[a] church is always free to burden its activities voluntarily through contract, and such contracts are fully enforceable in civil court." *See also, e.g., Rayburn*, 772 F.2d at 1171 ("Like any other organization, [churches] may be held liable . . . upon their valid contracts."). Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights. Accordingly, application of state law to Petruska's contract claim would not violate the Free Exercise Clause.

Similarly, at least at the outset, resolution of Petruska's breach of contract claim would not excessively entangle the court in a religious matter. For purposes of evaluating Petruska's contract claim, we need not examine Gannon's decisions with respect to which individuals will perform particular spiritual functions; rather, we need only inquire as to whether Gannon promised Petruska that she would be entitled

76

to perform those functions for a specified period of time. In that respect, the claim potentially can "be adduced by a fairly direct inquiry" into whether there was an offer, acceptance, consideration, and breach. *Minker*, 894 F.2d at 1360. If Gannon's response to Petruska's allegations raise issues which would result in excessive entanglement, the claims may subject to dismissal on summary judgment. *See id.* The allegations in Petruska's complaint, however, do not demand such a conclusion. I would therefore remand this claim for further consideration by the District Court.

## III.

A church's choice regarding who will perform its spiritual functions is, by its very nature, a religious decision. By rejecting this basic premise, the majority effectively declines to adopt a ministerial exception, placing this Court at odds with every other federal court of appeals to consider the issue. Because, in my view, the majority's holding permits governmental interference with a religious institution's constitutionally-protected choices in violation of the First Amendment, I respectfully dissent.